IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHN BARNETT, | ) CIVIL ACTION |
| | ) |
| | ) NO.: 1:20-CV-0280 |
| VS. | ) |
| | ) JUDGE: MARCIA A. CRONE |
| | ) |
| STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY INC. | ) MAG. JUDGE: |
| | ) |
| | ) JURY TRIAL |

---

ORAL AND VIDEOTAPED DEPOSITION OF

JOHN CALVIN BARNETT

DECEMBER 9, 2020

---

ORAL AND VIDEOTAPED DEPOSITION OF JOHN CALVIN BARNETT, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on December 9, 2020, from 10:36 a.m. to 4:52 p.m., before Michelle Kelley, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of The Daws Law Firm, 4055 Dowlen Road, Beaumont, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT
A

Q. Was it like a promotion?
A. Yes, ma'am.
Q. Okay. When you first were hired as a service tech/equipment mechanic, do you recall how much you were making?
A. 20 -- 25 or 26. I can't remember.
Q. All right. And what did your job, within that -- those job descriptions, require you to do?
A. It requires me to change oil in the equipment. They have -- on the bulldozers you have to drop the belly pans to do so. Any maintenance item that needed to be done, I'd -- I've performed that skill.
Q. Like what type of maintenance items?
A. Changed belts, hoses, hydraulic lines; repair bush hogs; repair the tractor, Kubota tractor, put a water pump and all on it. Do diagnosis -- diagnostics with a computer that they had that -- that's what it was for, to run the diagnostics on them. Keep all the -- keep up with how much oil's in each one of the holding tanks. Keep the shop clean. Keep up with all the parts and maintenance -- all the parts and filters that's needed and order them, as such.
Q. What was the difference between your job as a service tech and your job as the heavy equipment mechanic?

A. CEI.
Q. Okay. And that's the tipper that was involved in your accident?
A. Yes, ma'am.
Q. Okay. Prior to April 10, 2020, did you ever receive any training with regard to how to operate the tipper?
A. No, ma'am.
Q. And why is that?
A. It wasn't ours to operate.
Q. Okay. Prior to the accident, did you receive any safety training regarding the tipper at all?
A. No, ma'am.
Q. All right. Not from Waste Management or anybody else?
A. No, ma'am.
Q. What were Waste Management's policies and procedures with regard to the tipper, if any?
A. I don't recall at this time.
Q. Okay. So you don't recall if they had any procedures one way or the other?
A. No, ma'am.
Q. Do you recall, as we sit here, if they had any rules or procedures that prohibited you from operating the tipper?

A. No, ma'am.

Q. Do you recall if they had any policies or procedures that prohibited you from standing on the tipper?

A. No, ma'am.

Q. Prior to April 10th, had you ever been on the tipper before?

A. Yes, ma'am.

Q. Okay. Once or more than once?

A. About two times, maybe.

Q. Okay. What were you doing up on the tipper?

A. They called for me to jump off the engine.

Q. They called for you to what?

A. Give it -- give them a jump on the engine that runs the tipper.

Q. Okay. Anything else that you were doing on the tipper?

A. I think there was a truck there one time that I had to jump off too.

Q. Okay. So, like, the engine had died?

A. Yeah. Well, them batteries went down. We had to jump it off.

Q. Okay. And so that's something that you did in the course of your employment as a mechanic?

A. Yes, ma'am. I just -- I guess you'd call it as

a favor.
Q. Okay. But you would consider that part of your job when you were doing that. Right? You're being paid. You're at the landfill?
A. Well, I didn't know -- I don't know if it was considered part of my job. It's just something that they asked me to do, and I done it.
Q. Okay. Who -- what -- do you recall what driver you helped when you jumped their battery?
A. Oh, no, ma'am. I think it was a contractor truck, though.
Q. Do you recall when that occurred?
A. I think it was back in the spring. I ain't sure.
Q. Okay. Do you remember who called you and told you to come out and do that?
A. No, ma'am, I sure don't.
Q. Would it have been another Waste Management employee that called you to come out and do that?
A. Most probably.
Q. Okay. Did you have, like, CB radios that you used that --
A. Yes, ma'am, we've got a radio.
Q. Okay. So if somebody needed you, they'd call you on the radio?

A. Right.
Q. All right. And so the drivers wouldn't have had access to your radio; correct?
A. No, ma'am.
Q. Okay. So if somebody called you on the radio, it'd be a Waste Management employee?
A. Yes, ma'am.
Q. In this time, after you jumped the driver of that -- the truck, the battery that died, did you get any instruction from Waste Management after that happened that you were not supposed to assist drivers?
A. No, ma'am.
Q. Okay. Were you disciplined in any way for doing that?
A. No, ma'am.
Q. Anybody tell you that wasn't part of your job?
A. Not to my recollection.
Q. Okay. Other than going on the tipper and doing a jump twice in those situations, what other scenarios would you assist drivers at the landfill?
A. One driver asked for a chain -- borrow a chain, and I let him borrow a chain.
Q. And how would he have found you, under that circumstance? Somebody radioed to you?
A. Oh, no, he could stop by the shop.

Q. Okay. Do you recall who that driver was or what company he was for?
A. It was CEI's driver, but I don't remember what his name was. I never got to knowing too many of them.
Q. Okay. What other occasions did you have to assist drivers?
A. The only -- well, I -- one guy wanted a -- I mean, you know, I'd loan them a tool or a, you know, like, a wrench or tell them where a binder was or something like that.
The only other one I done was I helped Ms. Lyles one time. She was trying to get a windshield wiper blade on her truck, and it was raining. And I seen her having difficulty with it so I went over there and helped her put it on. Well, actually she got down, and I got -- because she had to stand on her tire to do it, and she wasn't quite tall enough to reach it, so...
Q. So you volunteered to help her with the windshield wiper?
A. Right. I didn't want her to slip and fall.
Q. Okay. And so drivers would come in to the shop and, I guess, borrow tools?
A. Every now and then, they'd be in. You know, just to -- so they could put things back together.
Q. Okay. In this instance where you gave a CEI

A. No, ma'am.
Q. Okay. Now, they're hauling those big, long trailers; correct?
How long do you think those trailers are?
A. They're at least 40 foot.
Q. Okay. And do you know how much those trailers weigh when they're full?
A. I don't know for a fact. I've heard that they -- they're a -- have about 20 tons in them.
Q. Okay. 20 tons, how many pounds is that? Like 80,000 --
A. Right at.
Q. -- maybe? Okay.
And that'd be when they're full?
A. Yes, ma'am.
Q. They're about 80,000 pounds? Okay.
Now, with the trailers, they're -- they're big, long rectangles; correct?
A. Right.
Q. And do you know how they're filled?
A. No, ma'am.
Q. Okay. Do you know where they're filled from, like the side, top, bottom?
A. No, ma'am.
Q. Okay. If I told you that those trailers are

filled from the top, do you have any reason to dispute that, that the trash is put in from the top?

A. No, ma'am.

Q. Okay. Do you have any reason to believe that the trash is filled in to the trailer from that back door?

A. No, ma'am.

Q. What do you -- what would happen if you filled the trailer with trash with that back door open?

A. It'd probably fall out when you got close to the end.

Q. Right. Because it's -- you're filling it up, and then it's just now start coming out.

A. Right.

Q. So that back door is letting them fill in more trash, I guess, all the way up to the top?

A. Yes, ma'am.

Q. How tall is that trailer?

A. Just guessing, it's about eight- to ten-foot.

Q. Okay.

A. The trailer itself, now. That's not including the tires and all of that.

Q. Yeah. I just mean the trailer.

A. Yeah.

Q. All right. So when the trailers come filled in

to the Waste Management facility, they're filled up to the top of that trailer; correct?

A. And sometimes above.

Q. All right. And so is trash pushing against that back door?

A. Yes, ma'am.

Q. All right. And the trailer just has one back door, is that correct, the back gate?

A. Yes, ma'am.

Q. And that's what opens whenever they dump the trash in the landfill?

A. Yes, ma'am.

Q. Okay. Would you agree that there's going to be pressure on that back gate as they come into the facility?

A. Yes, ma'am.

Q. All right. Because there's 80,000 pounds of trash; right?

A. Right.

Q. Would you assume that with 80,000 pounds of trash in the trailer that that door could just come open if it's not being held closed?

A. Yes, ma'am.

Q. Okay. And what's being held -- what's holding that door closed?

A. What I see is chains and binders.
Q. Chains and binders. Okay. And just for the record, I know -- your attorney and I know what it is, but the binder's kind of like a ratchet system.
Do you agree with that?
A. And so, yeah, those are ratchet binders.
Q. Yeah. So it's going to -- and the chain is a chain link; correct?
A. Right.
Q. So that ratchet is going to ratchet that chain back, and it's going to loosen it and tighten it; right?
A. Yes, ma'am.
Q. Other than the chain, are you aware of anything else that's going to keep that door closed?
A. No, ma'am.
Q. Okay.
A. May -- may we take a break at this moment?
Q. Yes, we -- yep. We can take a break.
THE VIDEOGRAPHER: We're off the record at 12:27.
(Recess from 12:27 p.m. to 12:38 p.m.)
THE VIDEOGRAPHER: We're back on the record at 13:38.
Q. (BY MS. O'CONNELL) All right, Mr. Barnett. Before we went off the record, we were talking about

just like the size of the trailer.
You recall that?
A. Yes, ma'am.
Q. Forgive me if I ask you the same question twice, because I -- I kind of lost my train of thought when we went off the record.
But do you recall, you testified earlier it's -- it's got at least, roughly, you think 80,000 pounds of trash in that trailer is your understanding; right?
A. Yes, ma'am.
Q. And it's filled all the way to the top; correct?
A. Yes, ma'am.
Q. And so the only thing keeping that trash in would be those trailer -- the trailer door on the back; correct?
A. Yes, ma'am.
Q. And you'd fully expect that to open if it had all that trash in there; correct?
A. Without something holding it, yes.
Q. Without the chains. Yeah. I'm sorry. Without the chains. Okay. And we testified earlier, to your knowledge, the only people responsible for supervising you on the landfill would be Waste Management

supervisors or personnel; correct?
A. Yes.
Q. All right. Other than yourself, is there -- have you seen any policies or procedures indicating that -- who was responsible for the safety of Waste Management employees at the landfill?
A. I think we all are to a point or for -- responsible for our own safety, but they do have safety rules and regulations. And we have safety meetings once a month.
Q. Okay. What do you guys talk about in those safety meetings?
A. They have different things, like the bloodborne pathogens. They've got the -- about traffic of their trucks and, you know, paying attention to which one's coming where and, you know, different rules like that. I mean, just pertaining to those kind of safeties. What's flammable. What's not flammable. You know, the standard procedures for safety.
Q. And in any of those safety meetings, did you guys discuss assisting drivers at the landfill, that you recall?
A. Not to my recollection.
Q. Okay. Have you seen any written policies regarding assisting drivers at the landfill?

A. No, ma'am.
Q. Have you ever heard, in those safety meetings, that any of the drivers are responsible for your safety under any particular circumstances?
A. Will you rerun that one by me again?
Q. Oh, yeah. I'll rephrase. That was a bad question.
Have you seen any policies or procedures that say that a driver is responsible for your safety if you're assisting them?
A. No, ma'am.
Q. And you indicated earlier that you're partially responsible for your own safety; right?
A. Yes.
Q. And how do you do that? How do you ensure you're safe each day when you're at the landfill with all that equipment running around and everything else?
A. You wear your proper PPEs and -- and just pay attention to the traffic.
Q. The traffic from the drivers?
A. Right.
Q. Okay. Do you know -- can you take me through -- what's your understanding of what happens, like, once drivers enter the landfill.
What do they do?

A. Once they pass the scale, they come -- the CEI drivers, they come and untarp their load, loosen their binders on the door, to my knowledge, and then they go up on top, up to the tipper.

Q. Okay. And I probably asked you this before, but under any circumstances were you ever told you were not allowed to assist drivers before April 10, 2020?

A. No, ma'am, not to my recollection.

Q. And, to your recollection, you were never disciplined for doing so; is that correct?

A. Yes.

Q. And, in fact, you had done so on at least a few occasions for -- true?

A. Yes.

Q. Okay. Do you consider helping drivers at the landfill when there's an issue part of your job?

A. No.

Q. Why not?

A. I guess it wasn't in the details of my job. I just, you know, I helped somebody when they were in a bind. It's just the thing to do.

Q. Okay. Would you agree that part of your job is anything another Waste Management employee asks you to do, says that they need assistance with?

A. Yes.

Q. Okay. And at least a few of those instances we talked about a Waste Management employee had radioed to you that a driver needed assistance; correct?
A. Correct.
Q. So under that circumstance, would you have considered that part of your job when you went to help that driver once you were radioed by a Waste Management employee?
A. I'm not exactly sure. There again, I just -- it was asked to help and I helped. I don't, you know, I never thought about it, considered it part of the job or not, you know.
Q. I got you.
Do you know what equipment drivers have on their trucks, other, you know, other than the truck and the trailer, but any particular equipment they have on their trucks to help them at the landfill?
A. No, ma'am.
Q. Okay. Other than Jennifer Lyles, did you interact with any other drivers on a repeated basis?
A. I mean, there was one or two. You know, you may go by and say, "Hi. How are you doing this morning?" But that's -- other than that, that's about it, you know.
Q. Okay. Now, in the year that you've -- at the

year, about, that you worked at the landfill, this was the only time that you cut a chain for a driver; true?

A. To my recollection, yes, ma'am.

Q. Okay. Do you have knowledge of other Waste Management employees helping drivers cut chains?

A. Yes, ma'am.

Q. Okay. Tell me about that.

A. I have not seen it. I've just heard that Charles would help them cut a chain.

Q. And what -- under what circumstances would that happen where they needed a chain cut?

A. I don't know the extenuating circumstances to the situation. I just know that he would cut a chain from time to time. I don't know if they'd just forgotten. I don't know.

Q. Okay. And he would use -- what would he use to cut the chain?

A. And he would use that Metabo blade on the grinder.

Q. On the grinder.

A. Uh-huh.

Q. Do you know why Charles chose to use the grinder versus the bolt cutter?

A. No, I don't.

Q. Okay. Do you know how often Charles did this?

A. No, ma'am, I don't.
Q. Do you know if Waste Management ever instructed Charles that he was not allowed to do that?
A. I don't know that either.
Q. Do you -- have you ever heard of Waste Management ever telling anyone prior to April 10th, 2020, that they were not allowed to assist drivers with chains, whether cutting them or whatever?
A. Not to my recollection, no, ma'am.
Q. Other than Charles, what other employees do you know of that would assist drivers at the landfill?
A. Sometimes -- let's see. Cory would -- like, if a gate fell off or it's door fell off or something like that, they would have to take the track hoe up there and pick that door up out of the hole so they could get it back on the truck.
Q. Okay. And they would do that with the track hoe?
A. Yes.
Q. And that's not any type of equipment the driver would be able to carry with them; right?
A. Oh, no, ma'am.
Q. Okay. So the door fell off.
What other circumstances can you think of?
A. Or like some of the trucks sometimes would get

stuff stuck in them in the roll-offs, and they'd take the track hoe again and rake it out for them.

Q. Other than using a grinder or bolt cutters, do you know of any other way to remove that chain once it gets stuck on a trailer?

A. I guess it'd be according to the circumstance. I mean, there's different ways.

Q. What do you know of?

A. Well, I've never tried any of them. I just -- you know, just from thinking or -- I guess you could push against the door with a dozer and relieve the tension and unhook it.

Q. Okay. And how do you -- how'd you come up with that?

A. I was just in the thought process of -- you said, asked me is there any other ways, and I was -- just -- that's just a way that I thought of.

Q. Okay. Have you seen anybody at the landfill use a dozer to push the door -- to push the door closed?

A. No, ma'am.

Q. So, I guess, in that instance, right, you're pushing the door closed to relieve the pressure and hopefully that loosens the chain?

A. Yes.

Q. Okay. I've -- I mean, I've talked to the

landfill people before, and they -- that -- that's a -- something I'd also heard, that they use a dozer to push the door in, and a dozer would be landfill equipment; right?
A. Right.
Q. And that's not something that a driver would be able to do. They would have to rely on the landfill people to do that; correct?
A. Correct.
Q. Okay. They're not -- to my knowledge, drivers aren't -- wouldn't be allowed to get on any of the Waste Management landfill heavy equipment; right?
A. Right.
Q. Okay. Any other ways you can think of to remove the chain?
A. If you really wanted to be wild, you could take a torch and cut it.
Q. Have you ever heard of anybody cutting a chain with a torch?
A. No, ma'am.
Q. Okay.
A. Well, not in that situation, but...
Q. Yeah. Okay. Between using the grinder and the bolt cutters, which one would get the job done quicker?
And, look, I'm -- not a trick question. I

don't want you to just give me an answer if you think you have to, but if you know.

A. Well, I really don't know. I would think that the bolt cutters would cut it quicker.

Q. Okay. And of the three we talked about, using a dozer or the bolt cutters or the grinder, which one would get that done quicker?

A. The bolt cutters.

Q. All right. Which of those do you think, at least in your opinion, would be, for a landfill person, would be safer?

A. Are you talking about which procedure or...

Q. Yeah. Sorry. Correct.

Which procedure do you believe would be safer: bolt cutters, grinder, or the dozer?

A. I guess, knowing -- it'd be according to the situation and how much tension you thought was on the chain, and it would just be a -- according to the variables.

Q. Why does it matter how much tension is on the chain for you to decide which one of those to do?

A. Because of the pressure that would be on the chain or tension and the door would have a tendency to have more of an explosive opening if there's a lot of pressure against it.

Q. Okay. 80,000 pounds is a lot of trash; true?
A. Right.
Q. True?
A. True.
Q. Okay. And so that door is always going to have a significant amount of pressure against it; true?
MR. DAWS: Objection. Ambiguous.
A. That there's another similarity of how it was loaded, who loaded it. You know, there's too many variables there to say an exact amount that would be on that door.
Q. (BY MS. O'CONNELL) Okay. Would it be -- I've heard a lot of landfill people say it's common sense that a filled trailer, that that door is coming open, whether it's been tipped or not.
Do you agree with that?
A. Well, it would come open, but, to the extent, it would be a difference, you know.
Q. Like a different force, I guess.
Is that what you're saying?
A. Yes.
Q. Okay. This -- this isn't the first time there's been some type of incident at the landfill, is there -- is it?
MR. DAWS: Objection. Ambiguous.

A. I don't get what you're talking about.
Q. (BY MS. O'CONNELL) I'll rephrase the question.
So we -- you already testified Jennifer Lyles is not the first driver at the landfill to have some type of issue with her truck or trailer; true?
A. Oh, yes.
Q. Okay. Does the landfill run perfectly every day?
A. No, ma'am.
Q. Is there always something going on at the landfill?
A. Most generally, yes.
Q. Always something needs to be fixed?
A. Yes, ma'am.
Q. Something that's going wrong; true?
A. Yes, ma'am.
Q. Okay. So things weren't running perfectly before Jennifer Lyles got there; is that fair?
A. Well, I don't know that we were having any troubles that particular day, to that point.
Q. But I just mean generally; correct?
A. Yeah. Generally. You know, you've got this dozer's broke or that one's broke or -- you know.
Q. Okay.
A. But that day I was doing -- it was not that

way.

Q. All right. So up until this time -- do you have any knowledge of whether or not Waste Management changed their policies after your incident, after April 10th? Any policies they changed because of your accident?

A. I don't even know where I heard it. I think they did.

Q. And to your knowledge -- and it's okay, like, you just know only what you know. Right?

But, to your knowledge, what changed?

A. They're not -- they're not allowed to help -- help any drivers.

Q. Okay. Anymore?

A. Anymore.

Q. And would that be a new policy?

A. Yes.

Q. Okay.

A. To my knowledge, I mean.

MR. DAWS: Hey, Jen, about how much longer do you think you've got before you get to that --

MS. O'CONNELL: Not a -- maybe five, ten minutes.

MR. DAWS: Okay. That's fine.

Q. (BY MS. O'CONNELL) And any other policies that

you're aware of that changed since your accident?
A. No, ma'am.
Q. Do you know whether or not any signs were put up around the tipper not to climb on the tipper?
A. I don't -- I don't recall if there was any up there or not.
Q. Prior to the accident, were there any signs telling you not --
A. No, ma'am.
Q. -- to climb on the tipper? No?
A. Huh-uh.
Q. Okay. All right. So you testified earlier there's no -- there was no rule before April 10, 2020, that you couldn't climb on the tipper; true?
A. Yes.
Q. And to your knowledge, there was no rule that you were not allowed to operate the tipper; true?
A. Oh, we just didn't. I don't know if there was no rule. I --
Q. Okay. But you didn't recall any specific training on that topic at all?
A. Oh, no.
Q. Okay. And to your knowledge there was no rule prior to April 10th about helping drivers; true?
A. True.

Q. And -- but you -- but there was no policies or procedures in place regarding that topic; true?
A. Not to my knowledge.
Q. Okay. And to your knowledge, before April 10th, there was no -- you didn't receive any training about trailers or cutting chains; true?
A. True.
Q. But there was no rule against it; true?
A. For -- to my knowledge, there wasn't.
Q. Okay. Would you agree that there's a lot of things that go on at the landfill that aren't covered by a policy or procedure?
A. Sometimes.
Q. You told me earlier you had a lot of different job duties; is that fair?
A. Yes.
Q. You're doing a whole lot of different stuff; right?
A. Yes, ma'am.
Q. Is there a policy and procedure in place for every part of your job that you do each day?
A. If there is, I didn't know where it was.
Q. Huh?
A. If there -- if there was, I didn't know, you know, if it -- where it was written down at.

Q. So, to your knowledge, no?
A. No.
Q. So a lot of this stuff you did on a day-to-day basis was -- what? -- on-the-job training?
A. Yes, ma'am.
Q. Okay. And it would be hard to have a written policy and procedure for everything; true?
A. True.
Q. Okay. All right. Y'all can go eat lunch.
MR. DAWS: All right.
THE VIDEOGRAPHER: We're off the record at 12:55.
(Recess from 12:55 p.m. to 1:35 p.m.)
THE VIDEOGRAPHER: Back on the record at 1:35.
Q. (BY MS. O'CONNELL) All right, Mr. John. Before we got off the record, we were just about to get to talking about your accident. All right. So let me ask you right before we get to that.
Prior to April 10, 2020, have you ever heard of any similar incident happening at the landfill, of somebody getting hit in the face with the -- a dump gate door?
A. No, ma'am, not to my recollection. I heard -- hadn't heard anything.

Q. Ever heard of any incidents involving the tipper where someone was injured?
A. No, ma'am. I don't recall hearing any stories about it or knowing any.
Q. Okay. Why don't you tell me in your own words what happened.
A. All right. I was servicing a mini excavator in the shop. Got a call on the radio. Brian called me to bring the bolt cutters.
Q. You said -- I'm sorry -- Brian?
A. Yes, ma'am.
Q. Okay.
A. So I pick up the bolt cutters, and I go up the hill to the tipper. I pull up and Charles was fixing to come down the hill to get the grinder. And I said, "Charles, I got the bolt cutters." And so he got them out of the back of the truck.
Jennifer, I believe, come under the -- Ms. Lyles come underneath the trailer. And I made a gesture to her. I said, "Oh, well, if I'd have knowed it was you."
And she gestured back, "Yes. I'm getting old and forgetful."
Then Charles went to try to cut the chain from the side, but the way he was -- had it, it looked like

he was fixing to fall.

So I told him to -- I said, "Charles, let's -- let's stop and wait a minute. Let's see if we can find a safer place." And so I got the bolt cutters, and I climbed up behind the trailer. And there was about a two-foot gap between the trailer and the side, and I put the cutters on there. And I thought to myself, "Well, let me move over some more." So I moved as far as I could to the right, looking at it at an angle, and I remember starting to push down on the cutters, but -- and then I hear a boom, and then the next thing I know, I'm flying in the air and then I hit in the hole.

And then, let's see. I reach in my pocket to get a rag to wipe my face. I felt something on my face. Let's see.

I believe I heard somebody radio that they said, "A man down," or -- and then I believe John Stanley, the one that's called Hickory Nut, I believe he was -- if I remember right, he was the first one to walk up there. And then -- and then I believe Cory showed up down there, and I think Brian eventually did. I'm kind of vague on who exactly was there.

They gave me some paper towels. Cory and either Hickory Nut or Brian, one, helped me walk out of the hole. That's when I felt my -- my right hip felt

like it was fixing to just go away. I mean, like I wasn't even going to be able to stand on it. But we finally got up the hill, and they put me in the truck.

They were trying to get an ambulance, but they said it'd be 30 minutes before an ambulance could even get there. So they determined that they could get me to the hospital in that 30-minute time span. So they put me in the truck and they drove me to the hospital.

Q. Okay. And what's the last thing you remember before the accident? Like, the very last thing before you were hit by the trailer door.

A. Hearing the boom. Hearing a boom.

Q. Okay. And what's the first thing you remember after the accident?

A. Landing in the hole. I mean, I was -- the way I described it is it -- you know, it's like you come to and it's like a dream you have. You're falling. Well, it -- that was what I come -- I got back my consciousness to. I was in the air falling, and I'm going. And there's nothing you can do about it, you know. And then I land, and I'm trying to think to myself, "What happened?" you know. "What just happened?"

Q. So you remember everything?

A. Yes. Yes. Most of it. I --

Q. How do you know -- did you lose consciousness? I saw a lot of initial medical records indicating you did not lose consciousness.
A. Ma'am, all I can -- here's -- the only way I can explain it is I heard the boom, and I could still see that sight, you know, the -- what I was looking at when I heard the boom. The next, I don't know, few seconds, then I come -- when I got my bearings back, I guess you'd call it, I reckon I was in the air flying. That's the short span that I don't --
Q. So if you did lose consciousness, it couldn't have been, what, for a second?
A. Just a few seconds, if it -- if, you know.
Q. Okay. About what time of day did this happen?
A. Around 10:00 I think it was.
Q. Okay. What time did you get to work that morning?
A. I think it was around 6:30.
Q. All right. So you've been working four hours or so?
A. Yes.
Q. Okay. And did you work the day before?
A. It was a -- yes, ma'am.
Q. Okay. But when did you go to bed the night before?

A. Heck, I don't remember. 9:00 or 10:00. I usually go right to bed around 10:00.
Q. What was the day like that morning? Did you have a lot of assignments? Normal day? What was going on?
A. No. Normal stuff. They just wanted -- the only thing I had in there was the -- to get that excavator. They wanted to -- they were supposed to come pick it up. Get it serviced, so they could come pick it up.
Q. Okay. Were you in any type of hurry?
A. No. I was there doing my work, you know, at a general pace.
Q. All right. Now, you said Brian called you. And remind me who Brian was.
A. He was an operator.
Q. Okay. And he called you on the radio?
A. Yes.
Q. Is that something typical, Brian would call you on the radio, summon you to come do something?
A. Yeah. If they've got a problem, they usually call me.
Q. Okay. And what did Brian say when he called you?
A. Best I can remember, he called me and told me

just to bring the bolt cutters. I can't remember if he said anything else or not. I just remember that's what he told me.

Q. And he must have told you where to bring the bolt cutters; right?

A. Well, there ain't but one place. I know where he's at, you know.

Q. What do you mean "you know where he's at"?

A. I know where he works at.

Q. Okay.

A. He works up on the hill at the tipper.

Q. All right. So he didn't say, "Bring the bolt cutters to the tipper."

You -- he just said -- he assumed you knew where he was?

A. He may have told me to bring them to the tipper. That's the detail that I'm not putting together right now.

Q. Okay. And did he tell you why?

A. I don't remember.

Q. How did you get to the tipper area at the hill?

A. I've -- the company truck.

Q. Okay. So you drive up in the company truck, and when you drove up, Charles was walking away.

A. No, he was in a -- they have a -- I guess you'd

call it a UTV or ATV buggy they drive. And he was coming by my when I drove up, and I told him, I said, "Hey, I got them bolt cutters in the truck."

Q. Okay. Did he say anything about whether or not you should use the bolt cutters or the grinder?

A. No. He didn't make no differentiation between the two.

Q. Okay. So you get up there onto the tipper, and you see Jennifer Lyles. And it sounds like you teased her.

What did you say to her?

A. I just said, "I might have knew it was you," you know, just as a joke, you know.

Q. At that point when you teased her, did you know what had occurred, why you had the bolt cutters?

A. I took it that the door was -- they needed to cut the chain on the door. That's the only -- about the only reason to get bolt cutters.

Q. Okay. Did you know why the chain needed to be cut at the cut?

A. I took it they had tried to dump it one time without unhooking the chain.

Q. Okay. So you just said the -- you assumed the chain was stuck, because that's about the only reason to get bolt cutters.

That's what you just said?
A. Uh-huh.
Q. Yeah?
A. Yes, ma'am.
Q. So you knew this has happened before, where the chain's -- for some reason a chain is stuck and the --
A. Right.
Q. -- bolt needs to be cut.
A. Right.
Q. Okay. And so you said at that point you knew that the -- that the trailer had been tipped?
A. Well, it was either that or it -- on the road up there, it put a bind on the chain where it couldn't be unhooked by hand.
Q. Okay. Will you back up to the specific conversation you had with Jennifer Lyles? So you teased her because you assumed that her chain was stuck or because somebody told you the chain was stuck?
A. No. I teased her because every -- they -- there was a problem with the truck, you know, and she was -- just her truck was setting on the -- on the tipper.
Q. Okay. And exactly what did you say to her when you teased her?
A. I just said, "I imagine," I said, "I might have

known it was you causing trouble," you know, just -- just as a general...

Q. Okay. And what did she say to you back?

A. She said -- so I believe she said -- she said, "Yes. I'm getting old and forgetful," or something like that, you know.

Q. Okay. So at what point did you learn that the trailer had been tipped? Who told you that?

A. Nobody actually told me it had.

Q. So you assumed it had been tipped?

MR. DAWS: Objection.

A. I knew the chain was in a bind for some reason.

Q. (BY MS. O'CONNELL) Okay. And what other reasons why the chain would be in a bind?

A. I didn't know if the load had shifted on the way up there or what the deal was.

Q. Okay. But earlier you said that you knew it had been tipped once.

A. I said I --

Q. So that's what I'm trying to get at.

How did you -- you assumed it had been tipped?

A. Just assumed it had. I mean --

Q. Okay. So at that point, you're walking up with the bolt cutters. You see Jennifer Lyles. You assess the situation, and it -- and you could have made an

assumption at that point that the trailer had been tipped and that's how it got stuck.

A. I guess so.

Q. Okay. And then earlier you said, also, it could possibly be because trash shifts around, and what would happen if trash shifts around while you're driving?

A. Well, it could -- it could push enough pressure that you can't do it by hand. It -- not a whole lot of pressure, but could be enough that you could not get the binder loose by hand.

Q. Okay. So either way -- under either scenario that you assumed, you knew that there was pressure on the door?

A. Oh, yes.

Q. On the chains, I guess?

A. Just didn't know how much.

Q. Okay. Who -- once you got up on the hill with the tipper, who was there? So you were there. Jennifer Lyles was there; right?

A. Right.

Q. Charles was there.

A. Yes.

Q. And was John Stanley/Hickory --

A. He was in the dozer, but he was not right at

the tipper.

Q. Okay. Was he in the pit in the dozer?

A. He -- well, he was axed up on the hill.

Q. Okay. Was anybody else there at this point?

A. Not that I recollect.

Q. Okay. So you teased Jennifer Lyles, and then exactly what happened?

A. Charles got the bolt cutters. He -- he went up there to cut the chain, and he tried to stand on like a four-by-four or six-by-six, whatever that beam is there, and it's had trash on it and stuff. He looked like he was going to slip and fall.

So I told him, "Wait a minute. Hold on, Charles. Let's see if we can find a safer place to get."

Q. Okay. And at that point you took the bolt cutters?

A. Yes, ma'am.

Q. All right. Did anybody tell you to take the bolt cutters, or you just voluntarily decided?

A. I just was volunteering. I just didn't want him to get hurt.

Q. Okay. Once you were on scene at the tipper, did you hear Jennifer Lyles ask Charles to cut the chain?

A. No, ma'am.
Q. Okay. Did Jennifer Lyles specifically ask you to cut the chain?
A. Not specifically.
Q. If not specifically, then what?
A. Well, I took it as an indirect, through Brian and Charles, that she had maybe asked them or something.
Q. Do you know why she wouldn't have been cutting the chain on her own?
A. I took it she didn't have the equipment to do so.
Q. Okay. Typically, it sounds like, from your testimony earlier, if the chain needed to be cut, that was something a Waste Management employee did?
A. Yes.
Q. Are you aware of any circumstances where a driver cut their own chain at the Waste Management landfill?
A. No, I'm not. I guess they could if they asked for the equipment to do it with.
Q. But under that circumstance, they'd be using the Waste Management equipment?
A. Yes.
Q. Are drivers allowed to use Waste Management equipment?

A. That -- I guess they can.
Q. Do you know one way or the other, or are you just assuming?
A. I don't know for a fact.
Q. All right. Okay. So she didn't specifically ask you, and you didn't specifically hear her ask Charles.
That's correct?
A. Correct.
Q. All right. And you were helping Charles out. You took the bolt cutters from him, and you decided to try to cut the bolt?
A. Right.
Q. Okay. I have some photographs. I think these were produced in discovery. I just want to ask you some questions so that I have a good idea of where everybody was standing and kind of what the scene looked like. Okay?
A. Okay.
Q. So this first one, for the record, we'll label this one as Exhibit 1.
(Exhibit No. 1 marked for identification)
Q. (BY MS. O'CONNELL) Is this a photograph of the tipper that was involved in your accident --
A. Yes.

Q. -- as far -- as far as you can tell?
A. Yes, ma'am.
Q. No reason to believe that's not the tipper?
A. No, ma'am.
(Exhibit No. 2 marked for identification)
Q. (BY MS. O'CONNELL) All right. And then this next one that we'll label as Exhibit 2, is that also the tipper but it's just from a different angle?
A. Yes, it is.
(Exhibit No. 3 marked for identification)
Q. (BY MS. O'CONNELL) All right. And then Exhibit 3, is that also the tipper, but I guess that's kind of from behind it?
A. Yes, ma'am.
Q. (BY MS. O'CONNELL) All right. And this last one I'll do as Exhibit 4.
(Exhibit No. 4 marked for identification)
Q. (BY MS. O'CONNELL) That's also the tipper?
A. Yes, ma'am.
Q. Are all the photographs, Exhibits 1 through 4, a photograph of the tipper involved in this accident, to your knowledge?
A. Yes, ma'am.
Q. Who's that guy in that -- in the photo of Exhibit 4?

A. That would -- looks like me.
Q. That looks like you? So at some point you went back to the landfill site for these photos?
A. Yes.
Q. Okay. Do you know when these photographs were taken?
A. No. I don't know the exact date and time.
Q. It -- it's okay you don't know the exact date.
Do you remember, maybe, about when? Like what month it was, how soon after the accident, anything like that?
A. I think it was maybe a month.
Q. Okay. Who was there with you when these photographs were taken?
A. Malachi.
Q. Okay. Anybody else -- excuse me.
Anybody else there with you?
A. I think Judson was. Then -- now, I'm going to forget their names. The supervisor for Waste Management was there and --
Q. Cecilia?
A. No. The one above her, Gordon.
Q. Okay. What's Gordon's last name?
A. That's a good question. I got his name, I think. No, I just got "Gordon at Waste Management."

I'm sorry.
Q. That's okay.
What's his phone number?
A. 713-825-6908.
Q. Okay.
A. And they had a lawyer there. I guess that was a lawyer.
Q. They had a Waste Management lawyer?
A. A -- yes.
Q. Do you know who that was?
A. No, ma'am. I do not know his name.
Q. Okay. Anybody else that you can think of?
Was Charles or Hickory there?
A. No, ma'am. They wouldn't, no. They may have been there, but we didn't see them.
Q. Okay. Which chain was stuck? The driver's side or the passenger's side?
A. Passenger's side.
Q. Okay. So of all these photographs, you would have been on the same side of the tipper as shown in those photographs?
A. Yes, ma'am.
Q. All right. Let's go -- what would you call -- point to Exhibit 3.
What would you call the back of this? Kind of

like, it looks like this is the back end or the tailgate of the tipper.

Is there a specific name for that?

A. No, ma'am. That's the side of the tipper.

Q. Which one am I -- oh, I'm sorry. I'm looking at this incorrectly.

What would you call this back piece, if you're facing this way?

A. That's just a guard.

Q. This is -- it's called the guard. Okay.

A. Yes, ma'am.

Q. Is there a portion of the tipper called the tailgate? The tail back?

A. Unless they're talking about this piece here. I don't know.

Q. And you're pointing to the brown piece on Exhibit 2; correct?

A. Yes.

Q. Now, what's shown in Exhibit 2? This would be the platform where the trailer is driving up; correct?

A. Right.

Q. Okay. And then what's this called, this bar?

A. Ma'am, I don't -- that's supports all I know.

Q. Just a support bar. Okay.

A. Yeah.

Q. So does the trailer back all the way up to this piece right here in Exhibit 2, this big brown piece?
A. Yes, ma'am.
Q. Okay. Can you point to me -- you can use any of those photos that's helpful.
Or, here, we'll label this other one as Exhibit 5. This shows more of the back of the tipper.
(Exhibit No. 5 marked for identification)
Q. (BY MS. O'CONNELL) When Charles was initially cutting the chain, where was he standing? Is that shown in any of these photographs?
Here. Here is an Exhibit 6, too, if this is helpful.
(Exhibit No. 6 marked for identification)
A. The best --
Q. (BY MS. O'CONNELL) This one?
A. Either that or this one here. He was standing right in this area here.
Q. Okay. So, just for the record, you're pointing at Exhibit 4 and you're pointing to this, kind of right here, where this -- where this rail sits.
A. Right.
Q. Is that correct?
A. Yes, ma'am.
Q. Can -- you mind if I put just put an X right

there so I don't forget?

A. No, ma'am.

Q. Okay. So you think Charles was generally right here. And, again, that's on Exhibit 4. Okay.

Where was Jennifer Lyles when you -- when you and Charles got up on the tipper? Is she shown in any of those photographs or where she was standing?

A. I think she was standing right beside Charles or there pretty close to him.

Q. Okay. So if we're looking at Exhibit 4, you think she was around the same area by this far --

A. I don't -- she might have been on that lower beam, right there.

Q. The lower beam.

A. Uh-huh.

Q. Do you have a specific memory of that, or you just kind of...

A. That -- that's the only memory I'm getting, is that's about where she was.

Q. Okay. And where was Hickory at this point?

A. Oh, he's up on the -- you -- it's hard to tell, because this is the hole.

Q. Right.

A. It backs up into a hill, and they back up on that hill where them dozers allow the truck to go, and

then they push the garbage.

Q. Would that be shown anywhere in Exhibit 6, maybe, where -- where Hickory was?

A. No, ma'am.

Q. Do you know about how far away he was from you?

A. I'd say that's about 50 to 75 yards or so.

Q. Okay. And so he's a little distance away, and Jennifer Lyles was next to Charles.

Nobody else was there at this point?

A. Yes, ma'am.

Q. Okay. So is -- on Exhibit 4, where we put the X, is that where Charles was trying to cut the -- the chain initially?

A. Yes.

Q. Okay. That's where he was standing.

And what did you think he was going to fall off of?

A. That piece right there because he was -- the bolt cutters are long, and he was trying to get them in a position to where he could push it together and --

Q. So you thought he might step off of this ledge?

A. I'm -- thought he might fall off of that or the chain, and the -- the recoil or, I guess you'd call it, from the chain when it cut. It will spring or slap. And I thought it would slap him off there. He could

definitely hurt hisself if it did.
Q. Okay. And -- I'm sorry. So you thought either he would step off the ledge or the chain would swing and hit him?
A. Right.
Q. Did you think there was any other danger with him standing in that spot right there at the time? No right or wrong answer. Just if you know or if you --
A. I don't know that there is anymore, but I -- that was just what I recognized at the moment. I could see, you know, it just kind of -- it just come to me that he could get hurt.
Q. Okay. Now, you see in Exhibit 4 -- so it looks like there's two support beams on either side of the tipper; true?
A. True.
Q. Okay. And the trailer is going to be backing in between those support beams; true?
A. True.
Q. All right. And Charles is standing outside of the support beam on the passenger side of the trailer.
A. Yes.
Q. True?
A. True.
Q. Okay. So if, from where Charles was standing,

if that door flung open, he wouldn't have been in the way; right? Because this support beam, not protecting him, but he's outside this support beam, and the door is opening in between the support beams; true?

A. True.

Q. Okay. When Charles was cutting, where were you standing while he was trying to do it?

A. I was back away -- it's not in that picture.

Q. Okay. Which picture?

A. It was -- I don't even know if you've got one. I was standing back out of the way.

Q. Would it be in this picture?

A. No. I was further to the left.

Q. Probably wouldn't be in this picture? No?

A. No, ma'am.

Q. Okay. All right. So it -- would any of those pictures, would you be able to point to and tell me where you were off of it?

A. I was probably -- you know, it's not on the picture, but I was probably to the -- further back off of this area right here.

Q. Okay. So just for the record, we're looking at Exhibit 1, and you're indicating you'd be off to the left of the picture, kind of in the dirt or water, I guess, what is shown.

A. Well, it -- it was actually some rock behind it is what it was.
Q. Some rock. Okay.
So when Charles was trying to cut, you were not on the tipper?
A. No, ma'am.
Q. Okay. How long was he trying to cut that bolt before you decided to get up there?
A. Not more than just a minute or two.
Q. Okay. And I'm just trying to remind you. Just let me ask the whole question before you answer.
A. Oh, okay.
Q. Yeah. Just because we've -- we've got to make sure the transcript is clean. Okay?
All right. So he's up there a minute or two, and then you get up there. And nobody asked you to get up there. You volunteered; true?
A. Yes.
Q. Okay. So what -- do any of those photographs depict the area where you first tried to cut the bolt? Let me know if you want me to hand you something.
A. I mean, the trailer was backed up here, and I climbed up and come behind here. And there was, like, a two-foot gap between that and that, and that's when I moved over to the side.

Q. So this is looking at Exhibit 2; correct?
A. Correct.
Q. Okay. So the first time you tried to cut the bolt, you got up behind there, or you were over by Charles first?
A. No. I climbed up between there because I could see where Charles was already trying to fall off of there, and I didn't want to do it myself.
Q. Okay.
A. I was looking for a safer spot.
Q. All right. So, in Exhibit 2 there's -- it looks like there's kind of two layers to the back of the tipper, correct?
A. Uh-huh.
Q. There's, like, this dark brown layer, and then there's the -- it's metal, and then there's the concrete layer behind it.
A. Yes.
Q. Right?
A. Yeah. Well, yes, ma'am.
Q. Okay. And what I'm pointing to, this would be the back of the tipper; correct? The end of the tipper, you know, before you get to the trash pit; right?
A. Right.
Q. Okay. So you just indicated you -- exactly

where did you climb up?
A. The best of my recollection is I went right in that gap.
Q. In the gap between the metal and the concrete?
A. Yes, ma'am.
Q. Okay. So if you -- I'll just do an X for where you -- if it even shows up -- where you climbed up. All right.
MS. O'CONNELL: You got a permanent marker in there? Thank you.
Q. (BY MS. O'CONNELL) All right. So you climbed up right here, and then did any of these -- so would it be right here, if we're looking at Exhibit 4? You climbed up right here in that gap?
A. Yes, ma'am.
Q. Okay. And how'd you get up there?
A. I just climbed.
Q. You just climbed up it.
Had you ever climbed up that side before?
A. No, ma'am. I have never had the opportunity.
Q. Do you know whether or not there's a policy or procedure against climbing up on the tipper, on the end?
A. No, ma'am.
Q. Okay. So you -- when you climbed up -- bear with me for one second.

Right here, what I'm going to label as No. 7, were you standing, like, on top up here?

(Exhibit No. 7 marked for identification)

A. Yes.

Q. (BY MS. O'CONNELL) Okay. So on Exhibit 7, you're standing -- were you standing on the concrete part or on the metal part?

A. The metal.

Q. The metal. Okay.

Which side were you standing on on Exhibit 7?

A. The passenger side or left.

Q. The left side of the photo?

A. Left side of the photo.

Q. Okay. Were you -- and can you -- can you draw an X for me of exactly where you recall standing when you got hit?

A. I was as close as you could get to that right there.

Q. Okay. And then on Exhibit 2, can you mark an X where you believe you were standing at the time?

A. No. Because -- well, I mean, I was as close to this as you could get. So it'd be right there, you know.

Q. Okay. So on this one, looking at Exhibit 7, so --

MS. O'CONNELL: Here. Sorry, Malachi.
Q. (BY MS. O'CONNELL) Here's the support beam that we were talking about. Right? And then the door is -- the trailer and the door is in between the support beam, and you're right here.
A. Right.
Q. Correct? Okay.
And when you were looking at that trailer door, what angle were you looking at it at?
A. I was looking at it at a -- like, the trailer door's here. It would be, say, a 20- or 30-degree angle --
Q. Uh-huh.
A. -- to it. That's what I was looking at. You know, like I say, there was, like, a two-foot span between the trailer and the wall. And I put the cutters on, moved it to the angle that -- at which I thought was a safe angle and -- and I cut the chain.
Q. You were wrong; right? That was not a safe angle?
A. I don't know how the door got me. I just know I was moving to be as far as I could out of the way.
Q. Okay. You were not standing to the side of the trailer; true?
A. Yes.

Q. Okay. But you were -- you weren't standing -- the side of the trailer was down here.

A. Not on the -- not beside the trailer, but I was standing at an angle at which I should, you know -- the door should have swung straight up and not got me.

Q. Okay. So just for the first question, so it's clear in the record, you were not standing beside the trailer. You weren't anywhere near the side wheels or the actual side of the trailer; correct?

A. Correct.

Q. You were looking straight on at that door, but from an angle. That door was in front of you, but you were shifted to an angle; is that right?

A. No. I was to the side of the door. The door was here, but I was not in front of the door. I was to the side of the door on the tipper.

Q. Okay. Were you to the side of the trailer?

A. I was not on the side of the trailer, no.

Q. Okay. So you were just to the side of where you thought the door would open?

A. Yes.

Q. All right.

A. I was out of the way. Had I took -- was out of the way.

Q. All right. Were you in a different position?

Did you try to cut the chain from a -- from one position first and then move, or you only tried to cut the chain from the position you marked as an X on Exhibit 7?

A. In only that one position.

Q. Okay. So you didn't try to cut it from the side first?

A. No.

Q. Why not?

A. Because Charles done like to have fell off the side.

Q. Okay. And so you thought -- you hopped on, and you got at the very end of the tipper where you're looking at the door but from an angle?

A. To the side, yes.

Q. You're looking at a -- on an angle to the side?

A. Right.

Q. All right. Bear with me for one second.

Now, you guys produced some photographs. They're the ones that we're looking at in discovery. And it looks like you guys went out to the landfill and you simulated the tipping process; is that -- that right?

A. Yes.

Q. And that's what you did with Gordon and your attorneys?

A. Uh-huh.
Q. All right.
A. Yes, ma'am.
Q. Okay. So in these photographs where we're simulating the tipping process --
MS. O'CONNELL: What am I on? 7? Sorry. I think it is 7.
O'CONNELL: Yeah. All right.
THE REPORTER: It should be 8.
(Exhibit Nos. 8 and 9 marked for identification)
Q. (BY MS. O'CONNELL) So I'm going to mark these as Exhibit 8 and Exhibit 9. Okay?
So were Exhibit 8 and Exhibit 9 photos that were taken when you guys were simulating this tipping process?
A. Yes.
Q. Okay. Now, it looks like, from these photographs, that during the tipping process the trailer is backed up and it becomes flush with this side piece, true, in the photograph?
A. Yes. It's even with it.
Q. Okay. Yeah. So it's even with it.
MR. DAWS: Objection. Ambiguous.
Q. (BY MS. O'CONNELL) So if I'm looking at

Exhibit 9, right here, there's no -- there's -- at least in your photographs you produced, there's no gap in between the -- at the back of that trailer and where the tipper -- the side of this tipper is this metal piece; right?

MR. DAWS: Objection. Ambiguous.

A. That's really not a good view of it because from this view, it don't look like there's nothing but a direct back view. You'll see there's a two-foot gap.

But, yes, it lines up with the back of the trailer from this angle. But from the other angle, you'll see there's a two-foot gap between the edge of the wall and the trailer.

Q. (BY MS. O'CONNELL) Okay. I understand the two-foot gap.

Now, at the time you were helping Jennifer Lyles, is this about the position the trailer was in, as what's depicted in Exhibit 9 and Exhibit 8?

A. Best of my recollection, it is.

Q. Okay.

A. If that trailer's all the way against the thing.

Q. All right. I mean -- I mean, looking at Exhibit 8, it looks like that trailer's all the way against it; right? I don't see any type of a gap except

a couple of inches, at least in that photo.
A. Yeah.
Q. All right. Looking at Exhibit 8, if someone is standing -- and I know this won't come out great on the record because I'm using a pen -- if somebody's standing right here, in Exhibit 8, by the tires, that would be the side of the trailer; correct?
A. Yes.
Q. All right. If somebody's standing right here, that'd be the side of the trailer; right?
A. Yes.
Q. All right. Anywhere that you stand on the side of the actual trailer, on the tipper, you're going to be outside of this support beam; correct?
A. Yes, ma'am, I think so.
Q. At -- well, at least from the photograph. It doesn't look like there'd be any room for somebody to stand inside of the support beam; correct?
A. I don't remember what the distance is there.
Q. Okay. And remember when you testified earlier, it looks like if you're outside that support beam in this area you're clearly outside the clearance of that door; right?
A. Yes.
Q. All right. Now, from your Exhibits 8 and 9 --

okay. So we've -- so now that we've established right here in Exhibit 8 and 9, this is the side of the trailer, you were inside of this wall; correct?
A. Right.
Q. All right. So you were behind the trailer door; true?
A. Yes, but not directly.
Q. Okay. But -- so now we can agree you were not on the side of the trailer. You were behind the trailer door.
A. Yes.
Q. Okay. But you were looking at it at an angle from the corner, I guess, the best you could; true?
A. Yes.
Q. Have you ever seen anybody climb up on the tripper like that in the past?
A. No.
Q. Okay. Did anybody tell you to climb up on the tipper and get up in there?
A. No.
Q. No Waste Management employee?
A. No.
Q. And not Jennifer Lyles?
A. No.
Q. Anybody suggest that that would be a good way

to get the chain off if they climbed up in this area?

A. No, ma'am.

Q. At any time, have you ever seen a person in this area on a tipper when it's being operated or when there's a trailer on it?

A. Only when they pull up to clean the tipper off.

Q. Okay. So when they back the trailer away from it?

A. Pull it up some.

Q. Yeah. Okay. So the -- where you climbed up, you were basically trapped in between that trailer door and then the very back concrete part of the tipper; true?

A. No.

Q. Okay. What -- why is that not true?

A. Because that outside piece on the back is not in line with this piece. It's offset to the outside.

Q. By how much?

A. About 18 inches, two-foot.

Q. All right. Other than that 8 -- 18-inch, two-foot gap, you're in between the trailer door and the back of that tipper; right?

Is this -- is this the gap you're talking about in Exhibit 9, right here? In between the concrete and the metal part of the --

A. That's where I climbed up at, yes.
Q. Okay. But other than that gap, you essentially trapped yourself in between the trailer door and the concrete back of that tipper?
A. No, ma'am. There's not a back on that tipper.
Q. All right. What's this concrete wall right here?
A. That's the side, and it's probably metal, not concrete.
Q. I understand that this is the side, right, this rectangle?
A. Yes, ma'am.
Q. Wouldn't you consider this part to be the back?
And you were standing on top, or you were standing at -- in -- inside of it?
A. To tell you the truth, these photos are not -- are not where I can really explain to you. Now, see, this is offset this away. The trailer sits here. There's a gap between this and the trailer of about two foot. So by looking at these photos, is looks like you're trapped, but there's nothing behind either one of these. The back of the tipper, it -- that thing pivots right here and rocks up.
Q. Okay. So you're on top, right here --
A. Right.

Q. -- on that one that I just -- on Exhibit 1.
A. Right.
Q. All right. So you're in between the back of the trailer door and the dirt -- and the pit?
A. Yes.
Q. Okay. Now, at this point I questioned you and you gave me a lot of different testimony about you -- you know that these trailers have a lot of trash in them; true?
A. Yes.
Q. 80,000 pounds. And you know that they're -- under any circumstance there's going to be pressure on those chains; true?
A. Somewhat, yes.
Q. What else would you call 80,000 pounds of pressure from trash? Some -- that's somewhat kind of pressure?
MR. DAWS: Objection.
Q. (BY MS. O'CONNELL) I mean, 80,000 -- that's a lot of -- that's a lot of pressure; right?
A. Right. I'm trying to think of how to -- but you don't know how much of it's against the door.
Q. If it's full to the top, could you assume all of the trash is pressed against the door?
A. No.

Q. Okay. But you testified earlier, you know, that just in the usual course of driving that trash can shift and get pressed against the door.

A. Right. But that don't mean that it's 80,000 pounds of it.

Q. Okay. And would --

MR. DAWS: Wait. Let me just -- I'm sorry. If I could just state an objection. I object to all the testimony about 80,000 pounds as misstating the facts.

Q. (BY MS. O'CONNELL) Okay. When you walked up to the scene, you previously testified you knew that that chain had gotten stuck because she tried to tip it; true?

MR. DAWS: Objection. Form.

A. That was an assumption. I just --

MR. DAWS: Misstates testimony.

Q. (BY MS. O'CONNELL) So regardless of whether we agree or disagree that somebody told you it had been tipped, it was an assumption that you made at the scene; true?

A. True.

Q. Okay. And so if you already knew at that point that the trailer had been tipped, you knew that there was pressure on that door; true?

A. I knew there was some pressure. I didn't know

how much.
Q. Okay. How else -- how -- what other information did you need to know how much pressure was on that door? If you already assumed that it had been tipped once, what other information did you need?
A. It'd have been nice to know it had been tipped twice.
Q. What in the -- in your mind, what difference does it make if it has been tipped once or twice?
A. Sometimes just one -- one tip don't make it all slide. So some -- and then with two tips, it shakes, and then they have been known to shake it and make it all settle down on the -- the whole load would then settle on the gate.
Q. Why wouldn't the whole load settle on the gate the first time the trailer is tipped?
A. That's a good question.
Q. You don't know?
A. It's according to how it's loaded.
Q. Okay. But you don't know; right?
A. No. Huh-uh.
Q. And as we sit here, you really don't know if there would be any difference in pressure on the trailer door if it was tipped once or tipped twice? If you had known --

A. No.

Q. That's a "no"? You don't know.

A. No.

Q. As we sit here, if you had known that it had been tipped twice, would that have changed what you did in this accident?

A. Yes, I do.

Q. Why would it have changed? Other than maybe your attorneys telling you it should have changed, what would have changed in your actions if you knew it had been tipped twice?

MR. DAWS: Objection to the sidebar and insinuation. What did we tell him exactly?

MS. O'CONNELL: You can object to form, but I'm not going to argue with you on the record.

MR. DAWS: Well, I'm asking, what did -- no, but what are you saying that I told him?

MS. O'CONNELL: I'm saying other than him being told what --

MR. DAWS: Just to be clear about --

MS. O'CONNELL: -- he should be say for liability, how would his actions have been any different if he knew it was tipped once or tipped twice?

MR. DAWS: But where did that come from, who told him what to say?

MS. O'CONNELL: I'm asking him. He's the one testifying.

MR. DAWS: You're asking him what I told him?

MS. O'CONNELL: I'm not asking him what anybody told him.

MR. DAWS: That's attorney-client privilege.

MS. O'CONNELL: I didn't ask him what anybody told him.

MR. DAWS: What did you ask?

MS. O'CONNELL: I'm saying other than what somebody may have told you to say --

MR. DAWS: You said your attorneys.

MS. O'CONNELL: Okay. What -- what does it make a difference? I'm not asking him --

MR. DAWS: Because that's privileged information.

MS. O'CONNELL: I didn't ask him what his attorneys told him.

MR. DAWS: I think you used the word "attorney."

MS. O'CONNELL: I'm saying other than what your attorneys or someone told you to say, what difference would it have made if you knew that that

trailer had been tipped once or tipped twice?
A. With the trailer being tipped twice then I would have knew -- I would have known there was a greater load on the door, and we would have proceeded in a different manner.
Q. (BY MS. O'CONNELL) So there wouldn't have been a heavy load on the door from it just being tipped once?
A. It would have been some load, but it -- not the anticipated load that was there.
Q. And how do you know that?
A. Well, I guess in all honesty you don't know.
Q. Hindsight's 2020, right, Mr. John?
A. Yes, ma'am.
Q. Okay. As we sit here today, while you're under oath, can you truly say that your actions would have been any different if you knew that that trailer had been tipped once or tipped twice?
A. Yes.
Q. And you think it's because you would have anticipated a greater load on the door?
A. Yes, ma'am.
Q. A greater load than it would have already on there from it being tipped once?
A. Yes.
Q. All right. And nobody at the scene told you at

this point that it had been tipped twice?
A. No, ma'am.
Q. Why not? Hickory didn't tell you?
A. Nobody told me.
Q. Charles didn't tell you?
A. No, ma'am.
Q. Okay. Do you think Hickory should have told you if he knew?
A. Well, I don't know. I thought it would do -- would be more on a -- the driver's responsibility, if they've tipped it twice and it's their problem, we're trying to help them fix it.
Q. Did you voluntarily make this your problem by volunteering and going up there to cut the chain?
A. How would I make it my problem? I'm just trying to help.
Q. Right. But you're -- you're taking on someone else's issue with their trailer; true?
A. I guess you do.
Q. If Charles knew that the trailer had been tipped twice, would you have expected him to tell you?
A. I'd have expected somebody to tell me. The driver -- I mean, why would you let somebody walk into a pit blind, you know.
Q. You weren't blind. You knew it had been tipped

at least once; right?
A. Well, no, I did not know that for a fact.
Q. But you already testified that when you walked up you assumed it had been tipped once.
A. Yeah.
Q. So we -- we can dispute all day, I guess, who told you what. But you at least assumed it had been tipped. So you did know; right?
MR. DAWS: Objection.
Q. (BY MS. O'CONNELL) And you testified --
MR. DAWS: Not what he stated.
Q. (BY MS. O'CONNELL) You testified earlier that you know that trash causes pressure on that door; right?
A. Yes.
Q. So you -- were you really going in to this situation blind, Mr. Barnett?
A. I was blind to the amount of pressure that was against the door. That was never a thought that it had that much pressure. Either -- whether it either shook down coming up the road or whatever, I never dreamed there was that much pressure on that door.
Q. Regardless of the amount of pressure that was on the door, is it safe to assume that door was going to come open when you cut that chain?
A. Yes. But only like six inches, not no whatever

it did do.

Q. Okay. But whether it was tipped once or twice, you wouldn't have known exactly how much pressure was on the door; true?

A. This is true.

Q. You just had to assume that there was pressure on the door; true?

A. Right.

Q. And you had a personal responsibility to stay out of harm's way under that scenario; true? True?

A. Yes.

Q. And you thought that you were outside -- out of the way of the door, but you weren't; true?

A. It's -- it's obvious I wasn't.

Q. So you misjudged the clearance of the door under that scenario; true?

A. I misjudged which way the door was going to swing. I don't know if it swung sideways or swung up. See, there's the possibility that door sprung sideways instead of straight up.

Q. What door -- are there trailers that go out there that -- that the doors spring sideways?

A. Ma'am, I do not know, but I know there's possibility of it because the bind was on one side only.

Q. Okay. And so you didn't observe -- you've

never seen that these trailers have chains on both sides?
A. Oh, yes, ma'am.
Q. Okay. Have you ever seen a trailer at the landfill that swung open from the side?
A. No.
Q. Okay.
A. Well, I mean --
Q. So --
A. Hold on. Let me -- they've got side dumps that the trailers -- the doors swing to the side. But none of these dumps like CEI's got.
Q. Okay. And would this tipper accommodate a trailer that swung to the side?
A. No, ma'am.
Q. All right. So this tipper that you were on would only accommodate a trailer door that swings open from bottom to top, like -- like a garage door?
A. Yes.
Q. Okay. And this is CEI's tipper, and you knew that CEI only had trailer doors that come open like a garage door; right?
A. Right.
Q. Okay. So back to your testimony of you didn't really know about the door clearance. You did know

about the door clearance. You knew before you cut that chain which way that door was swinging; true?

A. I knew it was going to swing up --

Q. Okay.

A. -- or should.

Q. You knew it was going to swing up.

How much time went by between when you grabbed the bolt cutters from Charles and you climbed up on that tipper and cut the bolt? Like, kind of how -- give me a time frame if --

A. Three to five minutes, maybe.

Q. Okay. How much time went by from when you actually got up on the tipper and when you cut the bolt?

A. Couple of, three minutes.

Q. When you got up on the tipper, when you were up in this position that we've been talking about, did Hickory say anything to you at that point like, "Hey, what -- what are you doing up there?"

A. No.

Q. Okay. Did Charles say anything to you, "Hey, what you doing up there?"

A. No.

Q. Did Jennifer Lyles say anything to you?

A. No, ma'am.

Q. What was Hickory doing?

A. I really don't know.
Q. Okay. What was Charles doing?
A. I guess he was standing on the side watching.
Q. Okay. And what was Jennifer Lyles doing?
A. Same thing. Standing on the side watching.
Q. Did she know that you had gotten up on there?
A. Yes.
Q. How do you know that?
A. Well, she was standing right there. She seen me.
Q. Let me put these in order really quick.
Whose fault do you think the accident is?
A. I think this belongs to CEI.
Q. And why do you think that? Just in your -- in your opinion.
A. Because it was their truck, their tipper. They took -- should have took ownership of the situation.
Q. Do you -- do you agree or disagree that you volunteering to help, that you took ownership of the situation?
A. I could have been stopped at any time.
Q. You were asked to come up with bolt cutters by a Waste Management employee; correct?
A. Correct.
Q. All right. Do you have any opinion as to

whether or not, under that scenario, Waste Management took -- took ownership of the situation?
A. No, ma'am.
Q. Okay. Right before you went to cut, did you have any communication with Jennifer Lyles?
A. No, ma'am.
Q. Other than when you walked up and you guys had that teasing exchange, did you talk to her again before this incident happened?
A. No.
Q. Okay. All right. I think this is the point we're at. Can we go off the record?
THE VIDEOGRAPHER: We're off the record at 2:23.
(Recess from 2:23 p.m. to 2:35 p.m.)
THE VIDEOGRAPHER: We're back on the record at 2:35.
Q. (BY MS. O'CONNELL) Mr. Barnett, when you walked up at this point to the trailer, and I think it's -- it's -- I don't think anybody is disputing at this point that Ms. Lyles at that point had tried to tip the trailer twice and that one chain was still attached and another chain was not attached; right? So it was the driver's side chain that was unlatched; correct?
A. Correct.

Q. Okay. What did the back of that trailer door look like?
A. On the passenger side I seen it was out about two or three inches.
Q. Now, the passenger side was the side you were trying to unhook; right?
A. Right.
Q. Okay. So it was out two or three inches. And what you mean by that is that the door was not flush with the side of the trailer; right?
A. Yes.
Q. Okay. So there was some -- there was some give in the chain and it was sticking out?
A. Right.
Q. Okay. What'd the driver's side of the trailer door look like?
A. I didn't pay attention.
Q. Okay. So you don't know one way or the another whether it was bulging out?
A. No, ma'am.
Q. Okay. So if we have information indicating that it was bulging out several feet on the other side, you don't have any information to dispute that?
A. No, ma'am.
Q. Okay. So before you cut -- before you cut the

chain from the trailer, you made an assumption that it had been tipped once. And you could see that the passenger side, despite the chain still being attached, was bulging out two to three inches.

And that wasn't enough for you to believe that there was too much pressure on the door?

A. Well, see, I -- at that point, I didn't know. You know, like I said, I was assuming -- I didn't know if it they partially tipped it and figured it, you know, the chain was on or if they had tipped it fully or, you know, I don't -- I didn't know at that moment. I knew that -- the only thing I knew for sure is the chain needed to be cut.

Q. And if the trailer door is pushing out two to three inches, what would be causing it to push out two to three inches like that?

A. Well, if you'll notice on one of your -- see that truck -- one right there, just normal -- just normally it's loose.

Q. It's bulging from the trash.

A. Just normally pushed out a little bit from the trash. That's with both chains off but no trash is coming out.

Q. That's with both chains off?

A. Right.

Q. Okay. When both chains are on the trailer door, what does it typically look like, if you know?

A. It seemed -- I've noticed some that they -- they're pushed back just a little bit, two or three inches, you know, or so, just barely. But if you'll see that one, once they take change, it still don't just fly open, you know.

Q. An empty trailer won't fly open?

A. No. The full trailers won't fly open.

Q. Okay. In every instance or just in some instances?

A. All for now -- you're asking a $64 question there. I don't know.

Q. $64? Where'd that come from?

A. I'm sorry. That's just a statement.

Q. No. I know. I'm -- I'm just kidding. All right.

So -- so is it fair to say that if the trailer door is sticking out a couple of inches that there's some pressure on that door?

A. Possibly, yes.

Q. It's fair. And in your experience working in the landfill, that's a fair assumption you could have made?

A. Yes, it had some. The degree is not known.

Q. Okay. Absent having some type of meter or scale, would you ever know the degree of pressure on the door with certainty?

A. No, ma'am.

Q. Okay. What would be causing the door to stick out like that even though the chain is still attached?

A. I -- just some pressure against it.

Q. Pressure from what?

A. I'd -- it'd have to be from the garbage.

Q. Okay. Were you in a hurry when you got up there?

A. No. Not too big a hurry. I mean, I just come to get the job done so I could get back doing what I was doing, but I was not in no hurry. I mean, you know, I didn't have time to conversate, and they didn't have time to conversate. And it wasn't a situation to conversate about, you know.

Q. Okay. Well, I guess I'm trying to figure out if you weren't in a hurry why you didn't -- why you didn't even look at the whole trailer door before you cut the bolt. Like, if you didn't even look at the left side.

A. I guess it -- with it no further than it out it was pooching, I thought, well, maybe it, you know, there wasn't much there, and it was just going to pop a little

bit, and, you know, just go on about my day.
Q. If you had looked at the left side of the trailer door and seen it bulging out, would you have made a different decision?
A. Yes, I would have.
Q. So why didn't you look at left side of the trailer door?
A. I guess I went on the -- Charles was going to cut it so I just took it that, you know, that's just what we needed to do, you know. I guess -- I guess I took the situation had already been assessed and that was what we needed to do was cut the chain, you know. I didn't need to assess it again, you know.
Q. As we sit here, do you believe that where you cut the chain, that that was a safe position to do so?
A. I thought so at the time, yes.
Q. But since you've had the accident, do you still believe that was a safe position to be in in order to cut the chain?
A. No.
Q. Was the position that Charles was in -- scratch that question.
If you could go back and do it again, I'm guessing you wouldn't have stood there; right?
A. Well, of course. If I knew what I know now,

yeah.
Q. And I want to get through some more questions that just have to do with the accident. I know that you were very hurt, and now I'm -- I want you to tell me all about that, but I just have some more questions just, kind of, about the facts and what Waste Management did and that kind of thing. Okay?
So Cecilia came to the scene. Cory.
Was it Brett?
A. Brian.
Q. Brian. Cory, Brian, Hickory, Charles, and Ms. Jennifer Lyles all come to the scene; right?
A. Right.
Q. Eventually.
And anybody else that you can remember?
A. There's one other hand, and I can't remember --
Q. So a young operator?
A. He was an operator --
Q. Okay.
A. -- but I couldn't remember. I can't remember his name.
Q. All right. And at the scene, now, you had just been hurt, obviously. So you wouldn't have given a statement or anything like that at the scene; correct?
A. No.

Q. Okay.
A. No.
Q. Other than talking to your attorneys, or if your attorneys took your statement, that's not what I mean, but anybody else take your statement with regard to this accident?
A. No, ma'am.
Q. Did Waste Management ever take your statement?
A. No, ma'am.
Q. What about the workers' comp adjuster? Did they ever take your statement?
A. Ma'am, it's been so long. I can't remember if they did. I think they did.
Q. Would it -- would they have taken like a telephone recorded statement?
A. I think so.
Q. That's usually what they do, huh?
A. I think that --
Q. Like, over the phone?
A. I think so. I have a vague memory of that's what they did. I'm not -- it's fuzzy from...
Q. Okay. So the next few questions, again, I just want to talk about kind of what Waste Management did after the accident.
Did anybody with Waste Management come talk to

you while you were at the hospital?

A. No, ma'am. They -- COVID, they couldn't.

Q. COVID. Okay.

When was the first time you spoke with Waste Management about the accident?

A. I guess it was about -- about two or three weeks later, I think, or maybe a month.

Q. And who did you speak with with Waste Management about the accident?

A. Well, no -- well, wait a minute, now. Let me get this all -- get you to an understanding. I think my daughter called the time-off-planning people that takes care of your time off. Now, I don't know if you're calling that "a talking to Waste Management or not." She talked to them after the accident.

But the actual people I work for, I did not talk to till a couple of three weeks. It may have been longer than that. Three to four weeks after the accident.

Q. Okay. And who did you speak with about the accident?

A. I talked to Gordon about -- I mean, it wasn't just exactly about the accident. He just was in question about how long he thought I'd be off and stuff like that.

Q. Did anybody with Waste Management specifically interview you about the accident?
A. No, ma'am.
Q. Okay. Do you know why that is?
A. No, ma'am.
Q. So you don't recall filling out any accident or forms for Waste Management detailing your recollection of the -- of the incident?
A. No, ma'am, I don't.
Q. Did anybody ask you to, and you just decided not to?
A. No, ma'am. I don't remember nobody asking me to fill out nothing.
Q. Okay. Is that typical protocol with Waste Management if an incident occurs? What's their typical protocol?
A. No. I think you're supposed to fill out something, but I don't know why in this case I didn't. And my daughter may have took care of something that I don't know about. I mean --
Q. Okay.
A. I don't remember.
Q. Have you seen any written statements that you did?
A. No, ma'am.

Q. I know that you said your daughter keeps track of a lot of things.
Have you kept any type of diary or notes to help with your memory with the accident?
A. No, ma'am.
Q. Any emails that you'd write to yourself? Anything like that?
A. No, ma'am.
Q. Okay. Did you write anybody, like -- and, again, nothing with your attorneys -- but did you write anything to friends or family where you're just kind of telling them what happened, maybe in a text message or an email?
A. No, I didn't.
Q. Do you know of anybody else, maybe, in your family that did that?
A. My daughter might have, to let my mom and my brother, you know, different ones like that know.
Q. Okay. And that's Brandice?
A. Yes.
Q. Your daughter, Brandice. Okay. All right.
But nothing first-hand account from you?
A. No, ma'am.
Q. All right. You were at the hospital by yourself because of COVID; right?

A. Yes.
Q. All right. So you talked to Gordon with Waste Management.
Did you ever talk to Cecilia and give --
A. I talked to her the same day, but it was, you know, just, "How you doing?" stuff like that.
Q. All right.
A. You know, it wasn't nothing.
Q. And Cecilia never asked you what happened?
A. Ma'am, I really don't remember.
Q. Okay. Other than going to Waste Management and you guys going through this tipping process and taking photographs, did you participate in any other investigation with Waste Management?
A. No, ma'am.
Q. Okay. Is there anything that you testified to me about the accident that is something somebody told you as opposed to your independent recollection?
A. No, ma'am.
Q. Okay. Is that every --
A. I'm trying to tell you as true as I can remember.
Q. All right. So everything we already talked about, that's just what you remember, not what Hickory or Charles told you?

A. Yes, ma'am.
Q. Okay. Do you know if Waste Management conducted any type of OSHA investigation?
A. No, ma'am, I don't.
Q. Okay. Do you know, other than these photographs, if Waste Management took any photos?
A. I think they had Charles take two photos.
Q. And he -- and you sent those to your -- did he send those to you?
A. Yes.
Q. And did you send those to your attorney?
A. Yes.
Q. Okay.
A. And I think you got them.
Q. All right. Do you know if Waste Management asked Jennifer Lyles what happened?
A. No, I don't.
Q. Okay. So you -- so one way or the other, you don't know?
A. I don't know. I mean.
Q. If there -- have you ever been involved in an accident investigation with Waste Management, like if somebody else got hurt on the job? Like maybe you were a witness or you had to fill out a statement.
A. No.

Q. Do you know, like, were you trained on what to do if there is an accident and you're involved or you're a witness?
A. No. I hadn't been trained to do that.
Q. Okay. You just know you got to tell somebody, I guess?
A. Yes.
Q. Is that a "yes"? Okay.
A. Yes. Yes. I mean, that's a standard procedure.
Q. All right. Did they have you take a drug test?
A. No, ma'am -- well, heck. I don't know what they done to me after I fell off in that hole.
Q. Okay. So you don't know, as we sit here, whether you took a drug test or didn't?
A. I don't know what they done to me.
Q. Do you know if Waste Management requires postaccident drug screens?
A. That, I don't know. They might with their regular drivers of their trucks, you know, the CDL drivers and stuff.
Q. But you're kind of just guessing?
A. Yes, I'm just guessing at that.
Q. Okay. All right. But you don't -- you don't know for -- for sure, yourself?

A. No, I do not know for a fact.
Q. Okay. After this incident did anybody discipline you?
A. No, ma'am.
Q. Any write-ups with Waste Management?
A. If they did, they didn't tell me about it.
Q. You have any conversations with any Waste Management employees where they were asking you why you climbed up on the back of the tipper?
A. No, ma'am.
Q. Okay. Now, other than helping Jennifer Lyles fix her windshield wipers prior to this incident, had you had any other interactions with Jennifer Lyles?
A. Not other than, like, she'd be the -- in the afternoons I might ask her how many trucks was left behind so I could tell the guys on the hill, you know. But that was -- just be a question of how many trucks you got left. And, you know, and she'd say, "Well, there's one more behind me." So the people on the hill, they can't leave until the last truck runs.
Q. Okay. But other than just those normal --
A. Not -- no, nothing --
Q. -- employment interactions. Okay.
You don't know her outside of work?
A. No.

Q. Have you spoken with her since the accident?
A. No, ma'am.
Q. Has anybody in your family spoken with her?
A. No, ma'am.
Q. Has she tried to contact you?
A. Not to my knowledge.
Q. Okay. Do you know what she did immediately after your accident?
A. No, ma'am.
Q. Okay. Do you recall having any interaction with her -- right after the incident on the scene?
A. No, ma'am. I'm -- they took me right out of the hole in the truck and to the hospital.
Q. All right. And so, basically, do you know why she didn't unhook the passenger-side chain?
A. No, I don't know.
Q. Have you heard anything about why she hasn't unhooked the chain?
A. No, ma'am.
Q. Do you believe that she did that intentionally?
A. No, I don't think it was intentional.
Q. You don't have any information indicating that she just intentionally, you know --
A. Oh, no.
Q. -- dumped with a chain attached; right?

A. No.
Q. It -- do you believe it was more likely a mistake?
A. Yes.
Q. Okay. Do you have any information to indicate that prior to this accident Jennifer Lyles was an unsafe driver, to your knowledge?
A. Not to my knowledge.
Q. Okay. Did she ever say anything or do any actions in front of you that led you to believe that she was an unsafe driver?
A. No, ma'am.
Q. Okay. Did you have -- ever have any bad interactions with her, like any arguments, any terse conversations?
A. No, ma'am.
Q. Was she always friendly with you?
A. Yes, ma'am.
Q. Okay. Your -- the -- there's a lawsuit filed on your behalf; right? You know that?
A. Yes, ma'am.
Q. And have you read the lawsuit that was filed on your behalf?
A. No, I don't think I have.
Q. Okay. And that's okay. That happens. In

paragraph 6 of your lawsuit, it indicates that CEI operates over 600 tractors and a thousand trailers daily.

Do you know where that information came from?

A. No, I don't.

Q. Do you know how many loads the CEI drivers haul to the landfill per day? Like each -- each driver individually?

A. I think each driver tries to get four loads a day.

Q. And how do you know that?

A. Well, this is just information I heard. I don't know whether you want it or not, but --

Q. You can just tell me -- tell me what you heard or what you know.

A. They do it because of the way they get paid. They need to haul four loads a day to make any kind of money.

Q. Okay. Is that typically how drivers for the landfill get paid, per dump?

A. I don't know if it is or not. I just know that's the way they're paid.

Q. Okay. Do you have any information indicating that Jennifer Lyles was in a hurry that day?

A. No, I don't.

Q. Okay. Do you know what gross negligence means? It's okay if you don't. I'm just asking.
Do you have any opinion as to what that means?
A. No, I don't.
Q. Okay. Do you believe that Jennifer Lyles intentionally had an extreme disregard for the safety of people around her?
A. No, I don't.
Q. Do you believe that Jennifer Lyles could have anticipated what was going to happen to you? Like she knew ahead of time that that trailer door was going to hit you in the face?
A. No. I don't think no one could.
Q. Do you believe that Jennifer Lyles showed a conscious indifference for the rights and safety and welfare of the people at the landfill?
A. I don't quite understand what you're asking there.
Q. So was she consciously trying to be an unsafe driver? Do you believe that?
And, I guess, conscious, another word for that would be intentional, right. You're -- you know what you're doing. You know that you're disregarding the safety of others.
A. I don't know how to fairly answer that

question, because I don't know what she was thinking, you know. I'd like to believe she didn't want nobody to get hurt, but I, you know, I don't know what she was thinking at that time.

Q. As we sit here, you don't have any information to indicate that she wanted you to get hurt?

A. Well, no, ma'am.

Q. Do you believe that if she did forget to unlatch that chain that it was an honest mistake?

A. Yes.

Q. Now, you've produced the recording -- we talked a little bit about it earlier -- but you produced that recording that you took of you and John Stanley's conversation. I have it on my laptop, and I kind of wanted to go through it because I had some questions about it. So this is what your attorney produced to us in discovery. Okay?

Do you remember having this phone call with John?

A. Yes, barely, but I remember it.

Q. Okay. I'm going to turn it up so you can hear it. I'm not going to play the whole thing for you. I just got a couple of -- now, at one point in the recording, it says that there was a -- somebody named Pat at the scene.

Who's Pat?
A. That may by that other fellow's name, Patrick.
Q. Do you think that's the operator?
A. Yes, that's another operator.
Q. Yeah, it's -- I won't play that part for you because it's okay, but they -- y'all talk about somebody, Pat -- named Pat.
You think maybe that was the operator?
A. Uh-huh. He was an operator. And he was over on the other side pushing dirt, if I -- if I remember right.
Q. Do you think Pat saw what happened?
A. That, I don't know. All I remember him being up there, and he brought -- he drove the company truck back because Cory trucked me down in his truck.
Q. All right. So he -- he may have seen something.
A. I don't know.
Q. All right.
A. That -- I can honestly say I don't know.
Q. All right. Bear with me while I have to scroll through this real quick. All right.
(Audio played)
Q. (BY MS. O'CONNELL) Why would you want Charles to make sure to stand behind the post?

A. Well, what he was explaining is that the chain will whip.

Q. The -- what? -- the whip in the chain?

And when you're talking about post --

A. I don't know what --

MR. DAWS: Objection. I'm sorry.

Are you saying that that's John Barnett or John Stanley who said that?

THE WITNESS: John Stanley.

MR. DAWS: That was Stanley.

MS. O'CONNELL: That was -- that was John Stanley. Or we'll call him Hickory. That might be easier. We'll call him Hickory.

THE WITNESS: All right.

MS. O'CONNELL: Oh, wait. No. I think that's Mr. Barnett.

MR. DAWS: Huh-uh.

THE WITNESS: Huh-uh. That was Stanley -- that was Charles -- I mean --

MS. O'CONNELL: Hold on.

(Audio played)

Q. (BY MS. O'CONNELL) See where he said "tailboard"? Is he --

A. He's talking about this whole piece here.

Q. Okay. So the -- if we're looking at Exhibit 1,

tailboard, he's talking about that whole --
A. The whole piece.
Q. The whole metal -- the whole metal brown piece left to right?
A. Well, the whole piece itself.
Q. Okay.
A. You see, to get an understanding, this whole piece rolls up. That's why they call it the tailboard.
Q. Okay.
(Audio played)
Q. (BY MS. O'CONNELL) What did Hickory mean by that: What in the world is he doing?
A. I don't know.
Q. Like, he didn't know why you were getting back there?
A. Right. I guess.
Q. Okay.
(Audio played)
Q. (BY MS. O'CONNELL) So at least in this conversation, Hickory, at least, knew at that point, for sure, that she had raised it up already,
A. Yeah.
Q. Would you have any reason to dispute that Hickory watched the whole thing, watched her tip it twice?

A. No.
Q. Okay.
(Audio played)
Q. (BY MS. O'CONNELL) So if -- if, at least from what Hickory saw, you weren't knocked out.
Do you have any reason to dispute that?
A. No. When he -- he said it right. When he got there, I done got up on my hands and knees and was trying to figure out what happened.
Q. Okay.
(Audio played)
MS. O'CONNELL: Sorry. Wrong part.
(Audio played)
Q. (BY MS. O'CONNELL) So right here, in this part of the conversation, it seems like neither you or Hickory know whether or not you hit that air conditioner.
Is this just something you guys are deducing based on the circumstances, that you must have hit the air conditioner?
A. I must have did because after -- let's see. When was it? I got my -- after they went to taking -- I had scar -- skins on my side, you know, and my clothes was tore, and I never knew how they got tore, you know. And I don't remember, because my shirt was tore and

stuff so and I don't -- and it -- and it was right -- you know, like I could have hit a glancing blow on it. It was right beside me.

Q. So you think your -- your clothes got torn by the air conditioner?

A. Ma'am, I can't tell you, honestly. I don't know how they got tore. My -- the shirt was tore and stuff, and I don't know how it got tore.

Q. Okay. I've got to get there. This is a two-part, so I need to pull up the other one. At some point you guys get cut off in the conversation, right, and you call him back?

A. I -- I guess.

Q. You don't remember this conversation; is that what you're indicating?

A. I don't remember it being two parts. I guess I -- it was. I don't...

Q. That's all right.

(Audio played)

Q. (BY MS. O'CONNELL) Why would the chain fly when you cut it?

A. Ma'am, I know of people that's been killed by a chain flying through the air.

Q. Who was killed from a chain flying through the air?

A. There was a young man we knew -- it wasn't at work. It was a guy pulling another guy out of a -- with a truck. The chain broke. Chain come back and hit him in the back of the head and killed him.

Any kind of chain, rope, or anything with that kind of tension on it, if you cut it, it's going to have a whiplash to it.

Q. Because of the tension?

A. Because of the tension.

Q. So you knew that there was enough pressure on that dump gate to cause a dangerous situation with that chain flying?

A. Well, I just didn't want to make it, you know, one way or the other. I didn't want it to fly.

Q. Okay.

A. No matter whether it had a little or a lot.

(Audio played)

Q. (BY MS. O'CONNELL) What does he mean that the door was "sprung"?

A. Like this is the door, it means the door was sprung like this where they still holding the hinges. So in a case like that, not knowing that it was that way, you cut the chain, instead of the door coming straight up, the door pulls to the side and then comes back to where it belongs.

Q. How did you not know the door was sprung?
A. I didn't notice the left-hand side.
Q. Because you didn't look at it?
A. No, I was just paying attention to that one side.
Q. Okay. But it sounds like Hickory, at least, knew that that door had been sprung, right, based on his conversation?
A. It sounds like it.
Q. Okay.
(Audio played)
Q. (BY MS. O'CONNELL) So it looks like, from this conversation, Hickory saw the whole thing.
A. As far as her dumping it, I think so, yes.
Q. Yeah. Okay. And so do you know if he relayed that to any other Waste Management employees before that chain was cut?
A. No, ma'am, I do not.
Q. Okay.
(Audio played)
Q. (BY MS. O'CONNELL) When he's saying, "when they called you," that was another Waste Management employee?
A. Yeah, Brian called me.
Q. Okay.

(Audio played)

Q. (BY MS. O'CONNELL) So he -- it sounds like Hickory couldn't have anticipated that you were about to cut the bolt when you jumped up there. He didn't know that's why you jumped up there?

A. I guess. I don't know.

Q. Okay. Do you have any reason to believe that Jennifer Lyles knew you were going to have to try to cut the bolt from that angle?

A. I believe she did, but, I mean, that's why I would -- got the cutters from Charles, is to try to cut it at a safer spot.

Q. But if Hickory didn't know that that's what you were doing up there, how would Jennifer Lyles have known?

A. Because she was standing there behind -- by -- where Charles and I were.

Q. Okay.

(Audio played)

Q. (BY MS. O'CONNELL) You were looking for a safer spot from what? What were you trying to be safe from at that point?

A. Well, if you would've seen Charles slide -- slip-sliding around on this side and trying to push down on them turn -- I mean, it was, like, you could see him

just kind of trying to balance up there and cut the chain at the same time. It didn't look safe at all.

Q. Okay.

A. And then, like I say, I got up there and moved all the way to the side and was only pushing down -- I put one handle against the bottom and started down on the chain, and before -- and before I really got a good push on it, I heard a boom.

Q. Why'd you move over to the side?

A. To get out of the way.

Q. Out of the way of what?

A. The door.

Q. So you knew the door was going to open?

A. Well, I knew it was going to come up. I didn't know how much, but -- you know.

Q. But you weren't completely out of the way of the door?

A. Well, I thought I was.

Q. Just like Jennifer Lyles thought she had removed that chain? All right. Here's another section.

(Audio played)

Q. (BY MS. O'CONNELL) Is he saying that was after the incident? So it just came up about two-and-a-half feet?

A. Uh-huh. Well, after the incident.

A. No, ma'am.
Q. That's all the questions I have for you, Mr. John.
A. Yes, ma'am.
MR. DAWS: Let's take a break. I'm going to have some questions.
MS. O'CONNELL: Sure.
THE VIDEOGRAPHER: We're off the record at 4:09.
(Recess from 4:09 p.m. to 4:23 p.m.)
THE VIDEOGRAPHER: We are back on the record at 4:23.

EXAMINATION

BY MR. DAWS:
Q. All right. Mr. Barnett, I have some follow-up questions for you. I'm going to try to be quick, and I'm going to bounce around a little bit. So bear with me. You were asked questions about pressure that ends up being on that dump gate.
Is that -- is that a fair term to call the gate that flew open and hit you, is the dump gate?
A. Yes.
Q. Okay. Is it accurate that you did not know the amount of pressure that was on that dump gate before you hit the chain?

pressure on that back dump gate.
A. Yes.
Q. You didn't know how much?
A. Yes.
Q. Okay. And you were assuming -- I think you testified -- that when you cut that chain you were expecting that back gate to pop a couple of inches.
A. Yeah.
Q. Okay. You were not expecting it to jump or pop up however many feet it did until it hit you in the face; is that true?
MS. O'CONNELL: Object to form.
A. That's true.
Q. (BY MR. DAWS) Okay. If you would have known that that back dump gate was under that much pressure, would you still have cut the chain?
A. No.
Q. What would you have recommended to have been done to fix the problem?
A. We could have put a come-along on the gate and pulled it back and took the pressure off the chain and then released the gate. Or as I've been -- as another recommendation, we could have hooked it back up, pulled it off the tipper, and put a dozer against the back gate and took the pressure off.


EXHIBIT 1
John Barnett
12/9/2020
Reported by: Michelle Kelley
CSR 9326
EX 1

PILANT
COURT REPORTING

# Transcript of the Testimony of
# LYLES, JENNIFER

**Date:** December 11, 2020

**Case:** JOHN BARNETT v. STAFFORD TRANSPORTATION OF LOUISIANA D/B/A CUSTOM ECOLOGY INC

EXHIBIT
B

Pilant Court Reporting
Phone: (800) 841-6863
Fax: (877) 474-5268
Email: deponotice@pilant.com

A. (Viewing photographs.) Yes, sir.
Q. And is this the same license that you carry as of today?
A. Yes, sir.
Q. What does the -- and what does the CDL license allow you to do?
A. Operate a commercial vehicle over 10,001 pounds.
Q. Okay. Does it make you, in effect, a professional truck driver?
A. Yes, sir.
Q. Okay. And when did you first get that?
A. In December of 2013.
Q. What was it that made you want to become a CDL driver?
A. At the time, I was dating a guy who drove trucks. Well, the reason I -- let me go -- okay. So, I got with this guy. I just wanted to change my life. I had a rough coming up and I wanted to change that, and this was a way to get from the environment that I was in. And the guy I was dating at the time was a truck driver and I got to see what it was like out there on the road with him and it caught my interest.
Q. Did he do long-haul trucking or --
A. He did, yes.

A. Fort Worth, Texas.
Q. What's the name of it?
A. It was FFE Driver's Academy. It was owned by KLLM Transport. And I believe that school has, now, moved to Lancaster, Texas.
Q. Okay. And, roughly, how long was the academy?
A. Three to four weeks. It would have been three weeks. We got froze out a few days. It was when they had a bad freeze that winter, so it lasted an extra week.
Q. Okay. What I would like to do is just confirm your work history. This is something you've already provided in your discovery responses. I'm just going to read through it and just ask you to confirm, yes, that's right. And if there is something that's not right, just let me know; okay?
A. Yes, sir.
Q. Let's start currently where you're at.
A. Okay.
Q. And then, we're going to work backwards.
A. Okay.
Q. So, currently, do you have a job?
A. Yes, sir.
Q. Where is that at?
A. CDL Mentors Truck Driving School.

Q. All right. And where is that located at?
A. In Lake Charles, Louisiana.
Q. All right. And what do you do for them?
A. I'm the head instructor over there over that school and the Baton Rouge school.
Q. When did you first take that job?
A. In the end of May, beginning of June. I think it was, possibly, the first week of June when I started. I'm not real sure. I know it was right around the month change. Because I was doing my paperwork for them at the end of May, but I think I got approved by the board maybe the first week of June.
Q. Okay. So, somewhere barely shy of two months after this incident happened?
A. Yes, sir.
Q. Okay. And have you worked there consistently since?
A. Yes, sir. The only time I did not was for -- since Hurricane Laura, the school was shut down until the very beginning of November, and I drove back and forth to the Baton Rouge school for seven weeks. I couldn't afford it anymore, and so, there was a one-week gap between when I stopped coming to Baton Rouge and Lake Charles opening back up.
Q. Okay.

A. So, it was one week I didn't work, but I was still employed.
Q. Okay.
A. Okay.
Q. That makes sense. If you would, just give us a summary of what your job responsibilities are at this academy.
A. I train students on how to do a pretrip inspection, their backing skills, and their road skills as far as operating a commercial vehicle.
Q. Okay. You're helping them to prepare to take the CDL test?
A. Yes, sir.
Q. All right. And so, before that, you worked at CEI. I've got it from September -- to be specific, September 10th, but if you can't recall the date, we can just go with September -- of 2019 until May of 2020.
A. Yes, sir.
Q. And we'll talk more in-depth about your work with them once we get through all of these things. What was the reason that you left that job?
A. I had been looking for a better opportunity months prior to what happened. This just happened to be the opportunity I had been waiting on at my current

stumbling through the question. And so, just let me get it all the way out and it's going to help her, but you're doing fine. So, you were an employee driver of CEI during the entirety of your employment with them?
A. Yes, sir.
Q. All right. And just, if somebody came up off the street and just asked you, hey, you know, what kind of work do you do for CEI, how would you explain it?
A. I would haul -- I would let them know that I haul waste loads from the Waste Management area in Calcasieu Parish to the Newton County Landfill, to the Waste Management area.
Q. The same route?
A. The same route every day.
Q. The same load?
A. No. Well, different loads.
Q. Well, I mean trash?
A. Yes, sir.
Q. Okay. Did you ever haul anything, other than trash and debris, for CEI?
A. No, sir.
Q. And it sounds like your starting spot was always the same and your ending spot was always the same?
A. Yes, sir.

Q. All right. And so, I want to ask you about the starting spot. What's the name of the facility where you would pick up the loads?
A. It's the Waste Management yard and we call it the transfer station.
Q. And where is that located?
A. On Highway 90 in Lake Charles, Louisiana.
Q. And you may know to the mile, how far is it between that transfer station and the Newton County dump?
A. It's 59 miles.
Q. And assuming you don't get bogged up in any kind of traffic and things go smoothly, how long does it take for you to get from Point A to Point B?
A. It's about an hour there and an hour back.
Q. All right. And at the -- we'll call it the transfer station, describe -- what is that like, what is there, how is it set up?
A. So, it's -- they have a hill there to where the little residential garbage trucks, they get in line, they drive on top of the hill. The trailers that we haul are pulled under the hill and the residential trucks dump into the trailers.
And then, once it's -- they -- the guy who is overseeing it calculates -- the residential guys are going to tell you I have 10 tons. So, he's going to

to 108,000 pounds. It's different than hauling a load that's half that weight.
Q. The normal federal weight limit is 80,000 pounds; right?
A. Yes, sir.
Q. And so, y'all are permitted to carry --
A. 108.
Q. 108. So, and what's the difference, in your mind, you know, from a driving standpoint, of carrying an additional 20,000 or so pounds?
A. Well, it's -- it's going to affect your stopping time. It's going to affect -- it's loose garbage in the back, so you don't really -- it's different than a secured load, so you have anything that could shift at any point in time. So, in curves or anything like that, the -- you know, it's -- the risk is heightened because of the weight. That is the most, over anything else.
Q. I hadn't really thought about that, as far as stuff shifting around being that it's just dumped in there.
A. Um-hum. (Witness nods head.)
Q. This is stuff is not strapped down; right?
A. No, sir.
Q. Are we talking about everything from, like, black

trailer?
A. You just pull your -- you have a pin in your fifth-wheel. You pull your pin in your fifth-wheel, and you just pull up slightly to where your trailer is still -- okay, under your trailer is a king pin, which is what locks it into the fifth-wheel.
So, you pull -- you just pull up enough to where that king pin is clear of the fifth-wheel so, when you come back down, it's going to sit to where you just back right onto it.
Q. Okay. So, how far do you pull up from --
A. Just enough to where that king pin clears the -- the fifth-wheel.
Q. Okay. So, are we talking about a foot or less?
A. A foot.
Q. Something like that?
A. Like, a foot, yeah.
Q. Okay. And how long does it take you to disconnect the truck from the trailer, usually?
A. Two minutes.
Q. Okay. And so, by the time you actually get your trailer on the tipper where you want it to be, it might take about a minute to undo your binder, about two minutes to disconnect from the trailer?
A. Correct.

Q. And then, you're walking to the doghouse where the tipper controls are; correct?
A. Correct.
Q. Okay. Is there anything else I missed about the tipping process so far that you do?
A. No, sir.
Q. Okay. I want to show you some pictures of the doghouse area we've been talking about. Okay. I think what we're going to do is do it in just a series like we did the last one.
A. Okay.
Q. This will be Exhibit 9 to your deposition. Actually, before we get to the doghouse, I'm going to mark a different picture as No. 9.
(Photograph marked for identification as Exhibit No. 9.)
BY MR. DAWS:
Q. What does this show right here on No. 9? (Handing photograph.)
A. (Viewing photograph.) The back of the tipper.
Q. Okay.
A. And the platform.
Q. Okay. Is this how it would have looked whenever the incident happened, you know, or before, except your trailer is not on there obviously?
A. (Viewing photograph.) Correct.

Q. I'll show you Exhibit No. 11. (Showing photograph.)
(Photograph marked for identification as Exhibit No. 11.)
BY MR. DAWS:
Q. Is this an accurate picture of how it typically looks whenever you're dumping a trailer on the tipper?
A. (Viewing photograph.) Yes.
Q. Okay. Can you see where -- can you see the sidewalls, the two different sidewalls (indicating)?
A. (Viewing photograph.) Yes.
Q. All right. And I'm going to label those as Sidewall 1 (indicating), and then, I can actually write on this one Sidewall 2 (indicating). What I'm asking is this: The back plate is somewhere right in there at the --
A. Um-hum. (Witness nods head.)
Q. -- at the back end of the trailer (indicating); right?
A. (Viewing photograph.) Yes, sir.
Q. Okay. Does that sidewall, is it even with the back plate, or does it extend past the back plate going towards the trailer (indicating)?
A. (Viewing photograph.) Oh, no, it's normally flush with the trailer. But some of the trailers have -- some may still have, like, a little bumper pad or

something that gives it that gap.
Like, they're not like this (indicating). They may have -- some of them have dock pads, like the little black things where, when you bump the dock, you're going to hit that and not the trailer.
Q. And if there's a bump pad, it would actually --
A. It would give -- yes, sir, it would give it a gap.
Q. And it -- okay. And so, the trailer wouldn't -- the trailer is going to go further against the back plate if it doesn't have a bump pad; right?
A. Correct.
Q. Okay. Those bump pads are about how long or about how wide?
A. About a foot wide.
Q. Okay.
A. You -- it usually has -- if the trailers do have them, they normally have, like, two, one on each side.
Q. Do you know the trailer that was involved in this incident, did it --
A. 858.
Q. -- have a bump pad?
A. Oh, did it have it?
Q. Yes, ma'am.
A. I do not believe.

Q. Okay.
MR. DAWS:
If we could see those trailer pictures, please.
COURT REPORTER:
(Handing photographs.)
BY MR. DAWS:
Q. All right. We're looking at Exhibit 7 again. Specifically, I'm showing you 7-3. (Showing photograph.)
A. (Viewing photograph.) So, no, sir. If it had them, they would be right here on this bumper (indicating).
Q. Okay. So, we've been able to confirm the trailer involved in this incident did not have a bump pad?
A. Okay.
Q. Well, that's what I'm asking you.
A. Oh, yes. No, it doesn't.
Q. Okay.
A. (Viewing photograph.) That's it right there (indicating).
Q. Thank you. All right. And so, what it sounds like you're saying is, typically, unless there's a bump pad, the back of the trailer, in other words, the edge of the dump gate door, is going to be even with

the side of Sidewall No. 1 (indicating)?
A. (Viewing photograph.) Correct.
Q. Okay. As shown here on Picture No. 11?
A. (Viewing photograph.) Correct.
Q. Okay. Thank you. All right. So, we've been talking about the process. You've unhooked the driver's side chain. You've walked into the doghouse. When you go to start it up, does it typically start right up?
A. Yes, sir.
Q. Okay. And if things go where you're able to dump it on the first tip -- about what percentage of the time are you able to just clear out your trailer just with one tip?
A. Ninety-nine percent of the time.
Q. Okay. Most of the time?
A. Um-hum. (Witness nods head.)
Q. How long does it typically take, from whenever you first start lifting up the trailer, until whenever you get it back down flush with the ground; is that one minute, five minutes?
A. I would say five to seven minutes depending on how fast the gravity pulls it out.
Q. Okay. How do you know whenever it's empty, just --
A. You're going to stop seeing it fall.

tipper to reconnect the chain and the binders, I mean, so that only takes, maybe, two minutes or so?
A. Well, two to five minutes. It depends.
Q. Okay. A couple of minutes. And then, you leave the landfill?
A. Correct.
Q. There's no more stops you have to make?
A. No, sir.
Q. Okay. So, going through this process, recapping, is it accurate that the CEI driver is the person responsible for driving the truck to the tipper?
A. Correct.
Q. And are they responsible for untarping the load?
A. Yes.
Q. Responsible for unchaining the dump gate?
A. Yes.
Q. Responsible for putting the trailer onto the tipper?
A. Yes.
Q. Responsible for disconnecting the tractor from the trailer?
A. Yes.
Q. Also responsible for making sure that the load is ready to be tipped?
A. Yes.
Q. Which includes taking off the tarp and the chains?

A. Correct.
Q. Okay. CEI drivers are the people that are responsible for operating the tipper?
A. Correct.
Q. Which includes raising it, emptying the contents, and lowering it?
A. Correct.
Q. Okay. CEI drivers are responsible for reconnecting the tractor to the trailer?
A. Correct.
Q. And then, also driving the trailer off the tipper?
A. Yes, sir.
Q. Reconnecting the dump gate chains?
A. Correct.
Q. And driving out of the landfill?
A. Yes, sir.
Q. All right. These are not -- these are all CEI driver responsibilities and not landfill employee responsibilities; true?
A. True.
Q. And you can do each of these things without any assistance from the landfill employees; is that right?
A. Typically, yes.
Q. All right. And during each part of this process at

the landfill that we just talked about, is it accurate that not only do drivers have a responsibility to do these things, but they've got a responsibility to do them safely?

MS. O'CONNELL:
Object to the form. You can answer the question.
THE WITNESS:
Oh, okay.
A. Yes.
BY MR. DAWS:
Q. All right. As a CDL instructor, you teach safety, probably, every day; right?
A. Correct.
Q. Now, the tractor and trailer, I don't think we've talked about. Both of those pieces of property are CEI property?
A. Yes, sir.
Q. Okay. And all the tools and equipment on the tractor and trailer, that's property of CEI also?
A. Yes.
Q. Do CEI drivers have a responsibility to take care of their equipment?
A. Yes.
Q. To not damage it, if possible?

A. Yes.
Q. Which can be hard to do in a dump; right?
A. Yes.
Q. CEI drivers have a responsibility to make sure that their rig, meaning their tractor and trailer, is road ready or road safe before they leave?
A. Yes.
Q. When you're hauling, you're in charge of your equipment and the load; is that right?
A. Yes.
Q. And no one can touch your truck or trailer without the CEI driver's consent?
A. I mean, yes.
Q. Okay. Meaning CEI entrusts y'all with the trucks and the trailers to make sure that y'all treat them right and that, just like if it was your own personal car, I couldn't just walk up to your car and start operating it; is that right?
MS. O'CONNELL:
Object to the form.
A. Correct.
BY MR. DAWS:
Q. Okay. The landfill employees can't touch your tractor without -- or can't touch a CEI tractor without the CEI driver's permission?

A. Yes, but they do.
Q. Okay. What's an instance where a landfill employee has touched a CEI driver's tractor without their permission?
A. The tractor, Mr. John himself has helped me fix the windshield wiper on my tractor.
Q. And that's fine. You asked him for help or you let him help you; is that right?
A. Correct.
Q. He didn't just go up there and do it without your consent?
A. Correct.
Q. Okay. And that's all I'm asking.
A. Oh, okay.
Q. Is if they're going to -- if they're going to do something on a CEI tractor or trailer, it's because the driver knows about it and they consent to it?
A. Okay. Yes.
Q. For instance, you know, because it's your responsibility or CEI drivers' responsibilities to unhook the dump gate chains, you're not going to have a landfill employee that's going to run over there and go do that for you because it's your responsibility; is that correct?
A. It is correct, but I've struggled before with some

that were stuck and they voluntarily helped me without being asked.
Q. Okay. Well, they helped you and you were agreeable to receiving their help; right?
A. Yes.
Q. Have they ever unhooked a chain without you knowing about it?
A. No.
Q. Okay. So, if they touched your dump gate chains, it would be because it was at your request or with your permission?
A. Yes.
Q. And even with your consent, say even whether it's a windshield wiper or it's putting air in a tire or it's helping you to unlatch a chain, you still have the right to tell them to stop rendering assistance if you want to?
A. Yes.
Q. You can say, don't do that, or you can say, stop doing that; is that right?
A. Yes.
Q. Okay. And has there ever been an instance that you can think of, whenever you were working at the landfill, where, if one of the employees has helped you or they have done something that you told them

not to do?
A. No.
Q. So, if we were to boil all that together, it sounds like the drivers have the exclusive right to control the tractor and the trailer and all the equipment on it, but, from time to time, they do ask for assistance from landfill employees; is that right?
MS. O'CONNELL:
Object to the form.
A. Yes.
BY MR. DAWS:
Q. All right. You know, I know it's a nasty environment working at the landfill, or even the transfer station, but you're working around big loads, you know, loads that are even -- you've got special -- I'm not sure what you would call special -- to haul more weight than usual, what is that called?
A. Um-hum. (Witness nods head.) Permit.
Q. You've got permits to haul even more weight than usual. And there's a lot of responsibility that comes with hauling big loads like that; true?
A. Correct.
Q. Is that something you teach your drivers?
A. Yes.

Q. Is safety paramount when operating a commercial motor vehicle?
A. Yes.
Q. Not only for yourself, but for coworkers or for the public at large; true?
A. Correct.
Q. And I wanted to ask you about this handbook. Do you know, after you got it, is it one of those things where you got it, put it in your locker or you brought it home, and you never read it, or do you remember actually going through it?
A. I, honestly, can't recall.
Q. All right. Fair enough. I'm going to point you to just a couple of pages just to ask you a few questions. If you go to page 2, and this is on Exhibit -- this is Exhibit 4, the handbook.
A. (Witness complies.)
Q. The date actually at the bottom of page 1 says October of 2019; is that right?
A. (Viewing document.) Correct.
Q. That would have been, I guess, a month or so after you would have been hired?
A. Correct.
Q. All right. Do you ever remember getting an updated handbook after being hired?

A. Not after the fact, I don't.
Q. Okay. All right. In fact, if you go to -- just go to page 5, actually, not 2.
A. (Witness complies.)
Q. Page 5, under the "CEI Values" section, the second paragraph, it says, "Safety and Compliance;" do you see that?
A. (Viewing document.) Yes, sir.
Q. All right. It says (quoted as read), "We strive to assure the complete safety of our employees, customers, and the public in all of our operations." I guess, what does that statement mean to you?
A. (Viewing document.) That they try to guarantee or do their best to be safe within the public, the employees, the environment.
Q. So, it means they're putting forth their best effort for complete safety; correct?
A. Correct.
Q. And the safety extends to coworkers, customers, and the public; is that right?
MS. O'CONNELL:
Object to the form.
A. Correct.
BY MR. DAWS:
Q. And would that safety also extend to landfill

employees as well?

MS. O'CONNELL:

Objection. I'm going to object to the extent she didn't draft this and she's being asked to interpret it.

THE WITNESS:

Should I answer?

MS. O'CONNELL:

If you know.

THE WITNESS:

I don't know.

MS. O'CONNELL:

But you're being asked to --

THE WITNESS:

Yeah.

MS. O'CONNELL:

-- answer something you didn't draft.

BY MR. DAWS:

Q. Well, let me -- just what's your -- as somebody who received the handbook, just what is your own interpretation of the extent to which the attempts to ensure complete safety extend to, and specifically, my question is, does that extend to landfill employees as well?

MS. O'CONNELL:

The same objection.
A. I think it extends to anyone around the vehicle.
BY MR. DAWS:
Q. Okay. If you will, go to the next page.
A. (Witness complies.)
Q. There on the second paragraph, it says (quoted as read), "It is your responsibility to review and gain an understanding of the contents of this handbook and sign the acknowledgement pages."
I know earlier you said you couldn't swear on the Bible that this was the handbook you received. But do you remember if, whenever you received the handbook, did you have an understanding that you had a responsibility to follow the rules that were in it?
A. (Viewing document.) Yes.
Q. Okay. That's with any job; right?
A. Yes.
Q. Okay. All right. If you'll go to -- let's go to page 24.
A. (Witness complies.)
Q. Under (quoted as read) "Standards of conduct," it says, "Each employee has an obligation to observe and follow the company's policies and to maintain proper standards of conduct at all times." Is that

your understanding, that all employees have a responsibility to follow the company policies at CEI?
A. (Viewing document.) Correct.
Q. Okay. All right. Go to 34.
A. (Witness complies.)
Q. All right. The very bottom section, "Company vehicles," are there rules that CEI has in place for maintaining company vehicles, do you remember?
A. (Viewing document.) I'm sorry. I was --
Q. Were there rule that CEI expected its drivers to follow to maintain their vehicles?
A. As far as safety?
Q. Yes, ma'am.
A. Well, that's what our pretrip inspection is for every day.
Q. Okay. And was there anything at CEI -- did y'all ever talk about -- you know, besides doing the pretrip inspections, which I know was every morning --
A. Um-hum. (Witness nods head.)
Q. -- did y'all ever have safety meetings there where you would discuss different aspects of safety in your job?
A. We did.

Q. How often would y'all have that?
A. I think, maybe, the two while I was there.
Q. Two of them?
A. The guy from here would come down there.
Q. Okay. So, how long were those meetings, roughly? Was that like a --
A. Maybe a couple of hours.
Q. Okay. And what were the topics that you can remember that y'all covered in those two different safety meetings?
A. I can't recall exactly what it is, but it -- it was -- we did a defensive driving one. And then, some -- I can't remember what the other one was. It -- it's, basically, they just retouch on safety topics.
Q. Did any of it touch on safety regarding the tipper?
A. Not that I can recall.
Q. Okay. Did you, as the captain or supervisor over the drivers, did you do any kind of safety meetings, was that a part of your responsibility?
A. No, sir.
Q. Okay. Was there anybody else who did any kind of regular monthly safety meetings, or is it just these two that you can recall?
A. Just the two that I can recall.
Q. Okay. Looking here at "Company vehicles," in the

handbook on page 34, it says (quoted as read), "Operators of company vehicles are responsible for the safe operation and cleanliness of the vehicle." Do you agree with that statement?
A. (Viewing document.) Yes.
Q. Okay. That's something you teach all of your drivers; right?
A. Yes.
Q. All right. Do you feel like that -- well, let's go to the next one, actually, on page 35.
A. (Witness complies.)
Q. There's a section about the -- it says (quoted as read), "Equipment machinery trucks and driver expectations". It says (quoted as read), "As an employee of Custom Ecology, you are obliged to adhere to the following conditions regarding use of company property," and then, it's got five bullet points.
And the second one states, "To operate all equipment, machinery, and property in a competent manner." When you worked there, were you aware that this is something you had to do?
A. (Viewing document.) Yes.
Q. Okay. What does that mean to you, to operate things in a competent manner?

A. To operate it and whether you're aware of what you're doing and what's going on.
Q. To be properly trained?
A. Yes.
Q. To be able to do it safely?
A. Yes.
Q. To not create a dangerous situation?
A. Yes.
Q. And do you agree that, if a driver is aware about some kind of hazard that has come up with their operating the vehicle, that they should take action to either warn others about that danger or protect them from it?
MS. O'CONNELL:
Object to the form in posing a hypothetical of a lay witness. You can answer if you can.
A. Can you repeat the question?
BY MR. DAWS:
Q. Sure. We're talking about operating equipment, machinery, and property in a competent manner. So, backing up just a little bit, for instance, the tipper --
A. Um-hum. (Witness nods head.)
Q. -- that would qualify as equipment or machinery that

drivers operate that is owned by CEI; is that right?
A. Correct.
Q. So, would it be accurate to say that drivers have a responsibility to operate the tipper and to perform that process in a competent manner?
A. Yes.
Q. Okay. And so, my question is that if a CEI driver is operating a piece of equipment or engaged in a process, and, in doing so, a dangerous situation is created that presents a hazard to other people, does that driver have a responsibility to warn others about the danger?
MS. O'CONNELL:
Object to form.
A. Yes, I -- yeah.
BY MR. DAWS:
Q. I mean, you wouldn't want somebody to walk up on a danger that you were aware about without them knowing about it; correct?
A. Without them knowing about it, correct.
Q. Okay. If we go -- this is the last page on this, ma'am, page 54.
A. (Witness complies.)
Q. The second section says (quoted as read), "Each employees responsibility." And can you read that

first paragraph for us, please?
A. (Viewing document.) (Quoted as read.) "Safety can only be achieved through teamwork at our company. Each employee, supervisor, and manager must practice safety awareness by thinking defensively, anticipating unsafe situation, and reporting unsafe conditions immediately."
Q. And if you had to restate that, what does that mean to you?
A. That, basically, you should go about your job in the safest manner that you can. And, if, for any reason, something occurs that that is not the case, you let someone know immediately.
Q. One word that stuck out to me, or phrase, it says (quoted as read), "Each employee, supervisor, and manager must practice safety awareness," and then, it lists three things.
It says (quoted as read), "By," one, "thinking defensively;" two, "anticipating unsafe situations and;" three, "reporting unsafe conditions immediately." Do you think that those three things are all essential components to practicing reasonable safety awareness?
A. Sure. Yes.
Q. What does it mean to think defensively just in your

own opinion?
A. Like, I'm a defensive driver. I don't just drive for myself. I drive for everyone around me. I watch the actions of other people, other than just myself, to make sure that nothing happens.
So, it's kind of the same thing. I'm defensive. I -- I'm -- I'm aware. I am -- how can I put this? I try to find issues before they are created.
Q. Okay.
A. So, to avoid having issues, should I say.
Q. It sounds like what you're saying is you look for -- you look for things that could present a danger in the future and try to take action to prevent them from becoming an actuality; is that right?
A. Correct.
Q. Okay. (Quoted as read.) "Anticipating unsafe situations," is that -- I mean, do you agree that's part of the responsibility of a CEI driver, is to anticipate unsafe situations when possible?
A. I think it's the responsibility of any driver.
Q. Okay. And (quoted as read), "reporting unsafe conditions immediately," so how would that play out in a practical sense, if, you know, you're a CEI driver and you're on the job and you recognize an

unsafe condition, who would you report that to?
A. Well, anyone around me to begin with, and then, my supervisor.
Q. Okay. Is that kind of -- is there a chain of command at CEI, I'm assuming, where if the drivers come across an unsafe condition, they've got a person to talk to, and is that Greg, the supervisor?
A. It's Joe.
Q. Joe?
A. Um-hum. (Witness nods head.) Joe -- Greg is only over the transfer station. Joe is over the company.
Q. Okay. So, if you were out at the landfill and there was an unsafe condition that manifested itself, and you thought, hey, there's a need to notify someone, is it Joe that you would have reached out to?
A. Yes.
Q. Do drivers have their cell phones on them --
A. Yes.
Q. -- when they're out? Okay. And can you think, during your entire time working at CEI, is there any time where you can remember having to reach out to Joe saying, hey, we've got an unsafe condition here that you need to be aware about?
A. Other than when this incident happened, no, I had no reason to.

Q. Okay. And do you mean that you reached out to Joe afterwards?
A. Absolutely.
Q. Okay. You know, looking back and seeing how the situation played out, do you think that this is a situation that you should have reached out to Joe to before it happened?
A. I didn't have time to reach out to Joe. By the time I knew why it was getting hung up and what was going on, this quick -- (indicating) -- Charles was there, John was there, and the accident happened. I had no time to do anything.
Q. Okay. You didn't have time to say stop?
A. I could have said stop had I known what he was doing.
Q. Okay. And then, if you look at these bullet points that are below there, one, two, three, four, five down, again, this is page 54.
A. (Witness complies.)
Q. It says, (quoted as read) "Understand your job fully and follow instructions. If you are not sure of the safe procedure, don't guess, just ask a safety or risk manager." What does that statement mean to you?
A. (Viewing document.) If I'm not sure of how to

handle a situation safely, get someone above me who does.
Q. And would that be Mr. LaRocca?
A. Yes.
Q. Okay. You need a break or are you good?
A. No, I'm fine.
MR. DAWS:
Ms. Court Reporter?
COURT REPORTER:
I'm okay.
MR. DAWS:
You're all right? Okay.
BY MR. DAWS:
Q. We had sent you some discovery and I'm assuming you would have looked over this.
MR. DAWS:
I'm not sure if you've got her interrogatories you can show to her or I can just read it to her, it's fine.
BY MR. DAWS:
Q. But there's one I wanted to ask you about. In Interrogatory No. 17 -- I apologize. Let me see if I can find it, make sure I get the right one. Okay. It is No. 17 if you've got that. Have you got that in front of you, ma'am?

A. (Viewing document.) Um-hum. (Witness nods head.)
Q. All right. So, I'm just going to go to your answer on subsection A. It says (quoted as read), "If the chain is tight and the trailer has not been tipped, there should not be any substantial risk other than trash pressing against the door. Trash will always be pressing against the door regardless of whether the trailer has been tipped."
Does that go along with what you had testified earlier about, you know, there may be some pressure against the back door and, maybe, whenever you undo the chains, it might pop up some, but it's not extraordinary pressure?
MS. O'CONNELL:
Objection. Complete mischaracterization of her testimony.
A. It's just saying that there's -- it's always a chance that -- I mean, that there will be some type of pressure. I can't tell you how much or if or not there is any, but it's a possibility. You should always assume there's pressure.
BY MR. DAWS:
Q. When you go and, like, you're undoing the binder to release slack --
A. Um-hum. (Witness nods head.)

Q. -- in it, at the point where you go to unhook the chain from the hook on the binder --
A. Um-hum. (Witness nods head.)
Q. -- the pressure is off the gate at that point; right?
A. Correct.
Q. Okay. So, when you unhook it off the binder, it's not jumping up anymore just because the pressure has been released; right?
A. Correct.
Q. Okay. And on your B answer, I had asked (quoted as read), "What safety concerns should be considered when trying to unlatch a dump gate chain that will not come unlatched after the trailer has been unsuccessfully tipped," so like in this situation where a chain was left on the dump gate, it was tipped, and then, you're trying to get it unlatched, what safety concerns would come about in that kind of situation?
A. It just adds more pressure to the back door.
Q. Okay. And with more pressure, does that create a higher risk of danger to the person trying to unlatch the chain just because there's all that additional pressure back there?
A. Not necessarily, unless you put yourself in the way

of the door.
Q. Okay. You can agree with me that, if, in a situation like that where you tip it, but it's still chained up, and then, you go about trying to undo the chain --
A. Um-hum. (Witness nods head.)
Q. -- and you've already loosened it as much as possible, and the chain still has pressure on it, you can't get the chain off the hook because there's just not enough movement, if someone were to go and try to cut the chain, there's really no way of knowing how much pressure is still on that gate and how much it's going to jump; correct?
A. Correct.
Q. And so, there's safer alternatives, in a situation like that, where you know that there's still pressure on the back gate, that instead of cutting the chain where you don't know how far the gate is going to jump, there are other ways to fix the chain problem in a more safe manner; do you agree with that?
A. I tried to retighten the chain myself, personally, to relieve some of that pressure. It wouldn't move. And cutting the chain was the only thing I was aware of. Anything else, I was not aware of.

MS. O'CONNELL:
So, he's not asking you, right now, about the specific accident. He's kind of just talking generally.
THE WITNESS:
Correct.
MS. O'CONNELL:
Do you understand that?
MR. DAWS:
Okay.
THE WITNESS:
Okay.
MR. DAWS:
And you're doing fine. I'm sorry.
BY MR. DAWS:
Q. What has been stated in your discovery responses --
A. Um-hum. (Witness nods head.)
Q. -- and also CEI's, is that another way to go about handling that particular problem in that situation, where you've still got pressure on the gate and the chain, is that, instead of cutting it, you could take the trailer off the tipper and use a piece of machinery to press up against the back dump gate to relieve the pressure, undo the chain, and then let the gate up slowly by backing off the equipment; is

that something that you agree could have been done to have handled the situation?
A. It makes sense that it's possible. I was just unaware of that being an option.
Q. Okay. That was not something that anyone at CEI had trained you as being an option up until that time?
A. Up until never. I've never been trained to do that. I've only seen them -- the Waste Management employees use a dozer to shut a door on an empty trailer because the door got messed up while dumping. But as far as to relieve pressure, I've never seen it myself.
Q. Okay.
A. It makes sense, but I've never seen it.
Q. Okay. It was nothing that you had ever been taught to do --
A. Correct.
Q. -- before this?
A. Correct.
Q. Okay. And so, was the only method for fixing the problem, in your mind, at the time -- well, at the time of this incident, was the only method that you were aware of to fix the problem would be to cut the chain?
A. Correct.

Q. And --
A. Well, let me rephrase that. Or to turn/tighten it myself.
Q. And you tried to do that?
A. And I tried that, yes.
Q. You could also try to loosen it, but I assume you loosened it all the way, too.
A. It was all the way loose.
Q. Okay.
A. Yes.
Q. All right. And so, besides adjusting the binder, the only other step that you were aware of was to cut the chain?
A. Correct.
Q. Okay. And do you teach your drivers any or have you ever been taught at CEI about, you know, the dangers of cutting a chain that has pressure on it?
A. No, sir.
Q. Okay. Have you --
A. I've never had the --
Q. Have you ever dealt with, like, tight straps or chains with pressure and had a fear about it coming back and hitting you?
A. I mean, I know that's common sense that would happen, but I don't put myself in situations to --

Q. Was that at least an understood risk at the time when this incident happened, that, hey, if these guys are going to cut the chain, you know, there is a risk that it could -- the chain could slap up and hit somebody?
A. No, not unless they sit in the path of it.
Q. And I think I'm asking one question and you're giving a different answer. You're saying that you understood that it was a risk, but you also knew that it could be mitigated if you stood out of the way of the chain?
A. Correct.
Q. Okay. You know, in a situation like that where the chain is stuck because of pressure, does CEI just say, well, it's got to get undone somehow; do they teach y'all to cut the chain?
A. No. The landfill -- we've just -- we've never run into an issue where we had to wonder what to do. They're always there to help us.
Q. Did you feel like, whenever you realized, crap, I'm not going to be able to get this chain undone, did you feel like you knew what needed to be done?
A. Yes.
Q. What needed to be done?
A. I needed to cut that chain.

Q. Okay. And so, is that what you asked the landfill employees to help you with?
A. I asked Charles, yes.
Q. Okay. And when you asked him to help you cut the chain, you understood that the chain could not be undone because of the incredible weight of pressure that was against it?
A. Correct, because I had already tried.
Q. Okay.
A. I, physically, was not strong enough to turn that binder like that.
Q. Okay. And I'm going to differentiate. I'm not talking about this incident; okay? But in a situation like what happened with this incident, where you've put the trailer on the tipper and you've attempted to tip it multiple times, and you had forgotten to take off a chain, and then, you go there and you can't undo the chain, if you ask someone for assistance, do you feel like you've got a responsibility to let them know that you have tried to tip the trailer at that point?
A. If they're unaware of what's going on, I would let them know.
Q. Okay. Do you agree or disagree that cutting a chain, after a trailer has been tipped, is a safe

thing to do?
A. Yes.
Q. You agree that it is a safe thing to do?
A. It can be, yes.
Q. Okay.
A. It can be done safely is what I mean.
Q. Is there a reason that you didn't attempt to cut the chain in this --
A. I'm not strong enough to cut through a chain.
MS. O'CONNELL:
Make sure you let him ask the whole question before you answer.
THE WITNESS:
Oh, yeah. I'm sorry.
BY MR. DAWS:
Q. Okay. Even with a grinder?
A. I don't know how to operate a grinder.
Q. They didn't teach y'all at CEI how to use -- well, do you know how to use a bolt cutter or a chain cutter?
A. Yes.
Q. Okay. Have you done that before?
A. No, but I'm aware of how to do it. I've had to cut a seal off the back of a trailer before, but it's plastic, not metal.

Q. Okay. So, I don't think I've asked this, so I want to be clear. And if you've already given your answer, then tell it to me again. Is it true that CEI did not specifically train you how to handle a situation where a chain is stuck because of a lot of pressure and you can't get it to come undone?
A. No.
Q. No, they did not train you?
A. No, they did not.
Q. Okay. Looking back, can you agree that -- well, I'm sorry, not looking back. Can you agree that, in a situation where the chain is stuck because of pressure, the safest way to get the chain unstuck would be to somehow relieve the pressure?
A. Yes.
Q. And in a situation where you're at the landfill and there's a landfill employee that's assisting you with something you've asked for help with such as cutting a chain --
A. Um-hum. (Witness nods head.)
Q. -- do you have a right to tell them to cease assisting you and to stop?
A. I -- I'm assuming I do.
Q. Had you ever been to the landfill apart from working for CEI?

A. No, sir.
Q. Okay. As far as people that work at the landfill, there's a couple of people's names I'm familiar with. Obviously, John Barnett. John Stanley who, I believe, goes by Hickory Nut. Also, Charles.
A. Um-hum. (Witness nods head.)
Q. I don't know how to pronounce his last name. And I know there's Cecilia as well?
A. Correct.
Q. Is there anybody else that you know by name that works out there?
A. Corey.
Q. Do you know Corey's last name?
A. I do not. He's the foreman.
Q. Okay.
A. And then, Bridgette. She works in the office.
Q. Okay.
A. Mike, he -- he works with Charles.
Q. Okay.
A. And I think that's all I know the actual names of.
Q. So, I'll ask a little bit about each person. Cecilia, is she, like, the manager out there?
A. Correct.
Q. Okay. Does she mainly stay in the office?
A. No. She's riding around in her pickup truck most of

the time.
Q. Okay. With all of these people that you ended up forming some degree of a relationship with, did you get to know them first by hauling out there?
A. Yes.
Q. Okay. Bridgette, is she the one who would help with the weight tickets?
A. Yes, sir.
Q. Okay.
A. Oh, and Jessica. I forgot about her.
Q. Is she an office worker as well?
A. The scale house.
Q. Okay. All right. And then, there is Mike, and I'm assuming you don't know a last name?
A. Unh-unh. (Witness shakes head.)
Q. Okay. What was your relationship like with Mike?
A. The same thing, he would wave, speak. It wasn't as -- me and Charles talked almost every day. Like, John spoke to me often. Hickory spoke to me often. Mike was kind of like on the pass by (indicating). But he knew me, I knew him, but there was no conversation, really.
Q. Yeah. Y'all would just greet each other and that would be it?
A. Yes.

Q. When you saw Mike, would he be like an equipment operator, or was he doing other things whenever you would see him?
A. Both.
Q. Okay.
A. He would drive the little duster around that cleans the cement where we go in, or he would pick up trash, or he would cut grass, or -- he was just one of those.
Q. Okay.
A. I don't know what his exact title is.
Q. No, that's fine. Corey, you had an understanding that he was the foreman out there?
A. Yes.
Q. All right. And what was the nature of your relationship with Corey, did you see him, you know--
A. Every day.
Q. Every day? Did y'all talk every day?
A. Almost every day, until the incident.
Q. Where would you see him at, like at the tipper or at the weigh station or --
A. Mostly at the bottom at the tarping rack. I -- I was always first. So, in the morning, I'm here. And they would all come out of the building and I would see all of them every morning as they would

come out. And then, Corey, I would see him throughout the day.

Q. Okay. With all of these people, do you feel like you had a good working relationship with them?

A. Yes.

Q. Okay. Nobody was mad at anybody?

A. No.

Q. Okay. I'm assuming Jessica or Bridgette, they never helped assist you with your job --

A. No.

Q. -- other than the weigh station?

A. Correct.

Q. Okay. What about Mike, did he ever help assist you do anything with your job?

A. I remember Mike being around the tipper, but I think he was just there when we complained about they weren't cleaning the trash on one side, so the wind would blow and it would pile up in certain areas, but I think that's the only reason he really had to work around the tipper that I can recall.

Q. Just to keep the trash down?

A. Yes. Not on the tipper, but on the side. That's their responsibility. But on the driver's side, there's like nobody else goes beyond that, so we're the only person that sees on that side.

Q. Okay. Do they call -- do you have an awareness that where you dump your trash at, is it dumped into something called the push lane or push pile?
A. They call it the push lane.
Q. Okay. And is it your understanding that, basically, where you dump at, they'll take a dozer and push it to a different area?
A. Correct.
Q. Okay. What about Corey, I know that you talked with him every day, or close to it.
A. (Witness nods head.)
Q. Did he assist you in doing your responsibilities out there?
A. He never really assisted me. But if -- he's kind of like Cecilia. If he had an issue with, maybe, something going on, the contractors or anything, he would kind of come to me and let me know.
Q. Okay. So, y'all would share information, but not necessarily do each other's job?
A. Correct.
Q. Okay. And what about Cecilia? I know you said you -- a lot of times, you would just see her probably a little bit everywhere, it sounds like.
A. Um-hum. (Witness nods head.)
Q. What was your relationship like with her?

A. Mostly, at the top of the hill.
Q. Okay.
A. Because he would mostly be the one pushing my trash. And so, almost every day, with either my first or my second load, once he pushed the trash and he could see me in the doghouse, he would stop there and he would hold a conversation with me.
Q. I understand. So, he would be on the equipment, he would cut it off and just --
A. Yes, and talk to me.
Q. -- talk with you for a minute? Okay. Did he ever assist -- you know, besides pushing trash, did he ever assist you with doing any of your responsibilities?
A. No. But I think he was the one that was putting diesel for us.
Q. Okay. And what about Charles, where would you see him at?
A. By the tipper. Charles was the most helpful.
Q. Where is it that -- you know, what would you see Charles doing whenever you were there?
A. He's -- he was always cleaning up, cleaning up trash, always picking up trash.
Q. Okay. Like, trash that wasn't where it was supposed to be?

A. Correct, that the wind would blow off or, when people would go to dump, it would just spread. On windy days, it -- I mean, it was horrible.
Q. I see they've got, like, nets and stuff out there to catch it. Would he clean the trash out of the nets?
A. I've never seen him go to the net. It didn't --
Q. Yeah.
A. I mean unless it's something that's there since I left. They weren't everywhere, so I mean -- they had a few nets, but they were off in one corner and they didn't really -- not to my knowledge. It's kind of behind the push lane?
Q. Um-hum.
A. That's the only ones I know of. I've never personally seen him in there.
Q. And Charles, did he ever help assist you with any of your responsibilities?
A. Yes.
Q. What would he do?
A. Like, okay, my binder broke one day. And I was trying to dump my load, and it was the driver's side. So, the binder stripped, so it wouldn't ratchet up or loose or nothing. So, I had him get the grinder and cut the chain in the hook where it was caught up on the side, and he did.

Q. Okay. And so, that was a situation where you had a trailer on the tipper, the binder wasn't functioning properly --
A. Correct.
Q. -- and you asked Charles for help?
A. Correct.
Q. And he got the grinder and cut the chain?
A. Correct.
Q. Okay. Any other instances you can think about where Charles helped to assist you do your responsibilities out there?
A. Not my personal responsibilities, but he would help keep my area clean even when Cecilia didn't want him nowhere around us.
Q. He would help keep the trash down near the tipper?
A. Yes, because it was -- well, if it was not on the tipper, it wasn't our responsibility. But she wouldn't want nobody near the tipper, so it was nobody was doing nothing about it.
Q. So, just so I've got it clear, trash that's not on the tipper, that's Waste Management responsibility?
A. Correct.
Q. Okay. So, if he's up there cleaning trash near the tipper, that's part of his job as a Waste Management employee?

A. Correct.
Q. There wasn't anybody saying, we're going to come up there and we're going to cut this chain off so you can keep moving?
A. No.
Q. Okay.
A. No one would have known it had I not asked. There's no one on that side but the driver.
Q. Okay. All right. Next, John Barnett, before this incident, what was your relationship like with John?
A. Very good, friendly.
Q. Okay. Is there any reason why it's not still good?
A. Oh, well, I mean, I don't -- I don't -- this. I don't know. I have no issue with Mr. John. You know, I hate that he's going through it, but --
Q. Have you talked with him since this incident?
A. No.
Q. Are you aware about any of his medical conditions that are going on?
A. I'm aware of what happened after the incident.
Q. Okay. You haven't had any -- I'm not sure if I even just asked you. You haven't had any communication with him since he left the landfill that day?
A. Correct.
Q. Tell us about what your relation was like. You

I'll ask it -- I'm going to try to do it as easy as possible. Before that second load, do you remember having any interaction with any Waste Management employee other than the ladies at the weigh scale house?
A. I don't recall.
Q. Okay. You're not saying it didn't happen, you're just saying you just don't remember?
A. Correct.
Q. Okay. All right. You take the tarp off; and that went smoothly?
A. Yes, sir.
Q. Okay. And then you went up the hill. And do you remember, when you first got to the tipper -- well, let's back up. When you were at the tarp, is that whenever you should have undone your passenger-side binder?
A. Yes. That's when I believed I had done it.
Q. Okay. But did you do it?
A. Well, after everything that's came up, and the more I think about it, at first, I started second guessing myself because I'm thinking maybe the chain got hung up or maybe I didn't do it at all, or maybe I just didn't take the chain out. I mean, it's the only logical thing that I can come up with, is that

I left the chain in.
Q. Okay. Has that ever happened to you before, where you tried to tip a load and there's still been a chain hooked up?
A. No.
Q. Okay. Thinking back on it, you know, if the working assumption is the most likely thing that happened was that you just forgot to do it -- I mean, this wasn't an intentional thing; right?
A. No. It was an honest mistake.
Q. Yeah. You didn't have a reason to leave the chain on while it was tipping?
A. No.
Q. Okay. And so, if we're chalking it up to just you forgot, is there anything, looking back, that you can think, you know, I was thinking about this or I was doing this and maybe it preoccupied my mind and that's the reason I forgot?
A. No. I remember I was having a really good day that day.
Q. Why were you having a good day?
A. I don't know. I just recall I remember having a good day that day, because Fridays are normally a little -- like I said, we're normally busier than normal. And just that day just happened to be a

incident at the landfill, you don't recall seeing the chain flailing?
A. I don't recall seeing it.
Q. Okay. And so, you get out of your truck. You then, first go and unhook the driver-side binder, and then, you disconnect your tractor from the trailer?
A. Correct.
Q. Okay. And then, do you go up to the doghouse?
A. Yes.
Q. Was the tipper already running or, no?
A. No.
Q. Okay. So, you turned it on?
A. Yes.
Q. And just tell us what happened next.
A. I turned it on and I raised my trailer and I attempted to dump my load. And then, when I saw nothing was coming out, my first thought, because it's what I was familiar with, is my trash is hung up.
So, again, I lowered it, bounced it a little, brought it back up, and nothing still wouldn't come out. So, at that point, I realized something was wrong.
And that's when I realized Hickory was getting my attention and pointing to -- telling me that the

then, I saw Charles.

So, I flagged Charles down, and Charles came. And I said, Charles, can you go get the grinder. And yeah, he went to walk away to get the grinder. And by the time he's going to get back on the golf cart -- the golf cart is about here (indicating), John pulls up here (indicating).

So, before Charles can even go anywhere, John pulls up, jumps to the back, and grabs the bolt cutters. This is how fast it happened (indicating).

Q. Okay. All right. I want to break that down a little bit. So, you were saying John was doing this -- and let's just call him Hickory.

A. Okay.

Q. Just so we don't confuse the two Johns. Hickory was in the push pile on the dozer. He cut it off. At this time, did you walk under your trailer, or around it?

A. I walked under it.

Q. Okay. You walked under the trailer, you're standing on the passenger side, and he is pointing up like you need to look over at your chain, your binder?

A. He's pointing and saying the chain is hung up.

Q. Pointing and saying the chain is hung up. And that was the first time that you realized the chain was

still hooked up; right?
A. Yes.
Q. And at that point in time, were you just shocked that it was still there, or did you have the, like, epiphany that I must have forgotten to unhook it and that's what the problem is?
A. Kind of both.
Q. Okay. And so, at that point in time, did you go over to the chain to try to see if you could -- I mean, I thought you said something about loosening it and tightening it?
A. Yes. That was the first thing before I even got to Charles and them. No, I immediately -- when he pointed, I was already at the back of my trailer --
Q. Okay.
A. -- trying to tighten the thing.
Q. And I'm just trying to get the right timeline.
A. Okay.
Q. The first thing is, after you set the trailer back down, you go underneath it, and John points out the chain?
A. Yes.
Q. Okay. Then, you go to the chain?
A. Yeah. I'm already walking to it as John is pointing to it.

Q. Okay. All right. And besides John saying your chain is hung up, did he say anything else to you? And I'm sorry, Hickory, that's who we're talking about at this point?
A. I believe he did, but I don't know the exact words to be honest. I think I was already getting picked on.
Q. Okay. You were already what?
A. They picked on me. That's how it is. It's like high school in there. They were picking on me because of what was going on.
Q. Who picked on you?
A. John, Hickory.
Q. So, how did Hickory -- so, you're saying he was picking on you --
A. John --
Q. Hold on one second. Hickory was picking on you that day?
A. Yes. Both Johns, him and the other one.
Q. Okay. And I just want to take it one at a time.
A. Okay.
Q. Was Hickory picking on you from the dozer?
A. I cannot recall if he was doing it before John got there. I recall John being kind of the one to kick off picking on me, because it was the first thing he

said to me.
Q. Okay. And that's fine. I'm just trying to take it one step at a time. You don't remember what you would consider picking on you until John Barnett showed up?
A. Correct.
Q. Okay. All right. Did John Stanley, Hickory, did he ever get off the dozer and come over to the tipper, or did he stay on the dozer the entire time?
A. He stayed on the dozer the entire time until John was at the bottom.
Q. Until after John had had his incident?
A. Yes.
Q. Okay. All right. Besides that initial conversation with Hickory, whenever he was pointing that your chain was on hook --
A. Um-hum. (Witness nods head.)
Q. -- did you have any other conversations with him or communications with him, between that point in time, and when John Barnett got hit with the dump gate?
A. Yes.
Q. Okay. What was that conversation?
A. I don't know exactly what we were talking about. Just like I said, I talk to these people every day. It was just random conversation, so I don't recall

every word we said. But yes, me and Hickory were talking in the midst of the accident happening.
Q. Okay. And that's fine. You remember that y'all had some social conversation?
A. Yes.
Q. You just can't remember the particulars?
A. Yes.
Q. Okay. Fair enough. And so, after the initial conversation with Hickory, the first thing you did, and you were already walking over to it you said, was go to the chain; is that correct?
A. Yes.
Q. What did you do when you first got over to the chain?
A. I immediately tried to see if I could tighten it. I knew right away there was no way it was happening.
Q. Why do you say you knew right away it wasn't going to happen?
A. I didn't have nearly the strength to -- and with the pressure on it, to even get that rachet to move.
Q. Okay. When you walked to the gate -- when you walked to the dump gate, and you were looking at it on the passenger side, was the gate still flush with the trailer, or was there a gap there?
A. There was a significant gap there.

were down at the tarp?
A. Yes.
Q. But during the tipping process, all this weight came against it and made it where you -- well, one, there was no more -- there was no more room to loosen it anymore. The only option was to try to tighten it, but that was impossible because of the pressure?
A. Correct.
Q. Okay. How long did you even attempt to try to tighten it for?
A. Like, maybe a minute.
Q. Okay.
A. It -- it was -- it was -- there's no way.
Q. Okay. All right. And so, what's the next thing you did after you realized you weren't going to be able to tighten it?
A. I immediately turned, and that's when Charles was coming with the golf cart. And I asked him, immediately, can you go get the grinder?
Q. Okay. And what did he say?
A. He said yes, because I had told -- he -- we -- we were -- it was obvious what was going on with the trailer. You could look at the trailer and you would see what's going on. You see there's a problem without even having to be said.

Q. And I think you said feet. Are you talking about a two-feet, three-feet gap, what are you talking about?
A. Like, maybe two feet or better worth of gap, like it's a pretty wide gap.
Q. Was the gap the same on the driver side as it was on the passenger side?
A. I don't know.
Q. Okay. All right. Did you ever get a look at the driver side to see what the gap was over there?
A. No. It wasn't in my thought process.
Q. Okay. Was there trash on the tipper?
A. As far as where?
Q. Like, right where the trailer and the dump gate open, was there trash that you could tell had come out of your trailer?
A. No.
Q. Okay. Here are some pictures that were taken by, I think, John Stanley, but I can't swear to it.
MR. DAWS:
15?
COURT REPORTER:
16.
MR. DAWS:
16. These are two pictures. We're going

to label them 16-1 and 16-2.
(Photographs marked for identification as Exhibit No. 16.)
BY MR. DAWS:
Q. Have you ever seen these pictures before? (Handing photographs.)
A. (Viewing photographs.) No.
Q. Do you know who took them?
A. You -- you just said John Stanley. Other than that, I have no idea.
Q. Okay. Did you take any pictures out there that day?
A. No.
Q. Did you have your cell phone with you?
A. Yes.
Q. Did anybody ask you to take any pictures?
A. No. Cecilia came up there taking pictures.
Q. You saw her taking pictures?
A. Yes.
Q. All right. It's my understanding that this is a picture that was taken after John's incident (indicating). Is this what it looked like as far as the type of trash that was in your trailer?
A. (Viewing photograph.) This does, yes.
Q. Okay. Do these look like pictures taken after the incident?

A. (Viewing photographs.) It could be, yes.
Q. Okay. And it looks like there's limbs and there's other trash. I mean, it's --
A. (Viewing photograph.) I wouldn't have seen it from this angle (indicating). But I did seem limbs. This would be the angle I could see from the side (indicating).
Q. These are both pictures taken from the passenger side; is that right?
A. (Viewing photograph.) Yes.
Q. Okay. And as best as you can remember, they accurately reflect the type of garbage you were hauling and what it looked like after John's incident?
A. Yes.
Q. Okay. So, when you first saw Charles, and you said he was on the golf cart --
A. Um-hum. (Witness nods head.)
Q. -- where was he at in relation to the tipper?
A. (Viewing photograph.) He was right here (indicating).
Q. All right. We're looking at Picture 15. And if I put a 2 right here (indicating) and circle it, that would have been the general area that Charles was at?

A. (Viewing photograph.) Yes.
Q. All right. Okay. And when you first saw Charles, were you still up on the tipper beside your chain?
A. I -- yes. I started to walk down to him.
Q. Okay. What kind of equipment do y'all carry in y'all's trucks?
A. (No response.)
Q. Like, I know you put in your discovery responses you had a hammer.
A. Yes.
Q. Okay. Well, what is a hammer for?
A. So, like if it's muddy at the landfill, and as you're climbing the hill and all of that, the mud is getting thrown up into the binders. So, once that mud starts to dry, it -- it -- you can't really get it to turn, so you use your hammer to knock it loose, knock the mud loose so you can use the binder.
Q. Okay.
A. And then, like for the swing-gate doors, you need it for one of the latches.
Q. Okay. All right. Any other equipment that CEI provides for y'all that y'all bring?
A. No.
Q. Have you ever been told that you should have this

kind of particular equipment on your truck in the event something happens?
A. No.
Q. No kind of toolbox or anything like that that y'all carry?
A. No.
Q. All right. Okay. And Charles was here (indicating). Tell me about, whenever Charles first pulled up -- is it -- I heard it's like a mule-type deal that he drives?
A. Yes.
Q. Okay.
A. It's like a --
Q. All right. What color is it?
A. Like, black, I think.
Q. Okay. Was it just him?
A. Yes.
Q. Is Charles white or black?
A. He's black.
Q. Okay. Whenever you saw Charles, what did y'all talk about?
A. This day?
Q. Yes, ma'am.
A. I told him, can you please go get the grinder. I -- I said something to the extent of, look what I did.

And he was like, yeah, yeah, I'm going to go get it so we can cut it on the side.
Q. Okay. Charles was not teasing you that --
A. No.
Q. Okay.
A. Charles, no.
Q. Okay. And any kind of back and forth? I mean, you said it was kind of like high school or whatnot. I mean, was it a mutual thing where everybody was just kind of ribbing each other? Was it done in good fun, I guess?
A. Yes, it was done in good faith[sic].
Q. Okay. And so, was that a quick conversation? Because you said I said I need you to get the grinder and did he --
A. Yes.
Q. -- turn around to go get it at that point?
A. He immediately turned around. And right when he was about to get back on the golf cart, John pulled up in the pickup.
Q. Okay. And what color was that pickup?
A. White.
Q. Can we see in this area where John would have pulled up, or is it a different picture (indicating)?
A. (Viewing photograph.) No.

Q. All right. I'm going to label this picture as 17 to your deposition.
(Photograph marked for identification as Exhibit No. 17.)
BY MR. DAWS:
Q. Okay. Can you show me, approximately, where would John's truck have been? (Handing photograph.)
A. (Viewing photograph.) Here (indicating). Like, right on this side of the -- (indicating) -- in the dirt next to the tires.
Q. Right in here (indicating)?
A. (Viewing photograph.) Yes, sir.
Q. All right. I'm going to put a 3 and circle it (indicating). This is Exhibit 17. Is this 3 the approximate location of where John's truck would have been (indicating)?
A. (Viewing photograph.) Yes.
Q. All right. And at that time, you're still up here on the tipper (indicating); is that right?
A. (Viewing photograph.) Yes.
Q. So, you're in the 1 -- you're in the -- okay. You're just up there at the tipper where you indicated in Exhibit 15 (indicating); right?
A. (Viewing photograph.) Yes.
Q. And is Charles in the 2 position where we see on Exhibit 15 (indicating)?

A. Yes.
Q. Okay. I just want to show you two pictures right quick. And I promise you we are about done. (Handing photographs.) Number 25, is this an accurate picture of what it looks like whenever a trailer is on the tipper and it has successfully been tipped?
(Photograph marked for identification as Exhibit No. 25.)
A. (Viewing photograph.) Yes.
BY MR. DAWS:
Q. All right. And for 26, is this an accurate picture of what a trailer would look like as garbage is coming out of it during the tipping process? (Handing photograph.)
(Photograph marked for identification as Exhibit No. 26.)
A. (Viewing photograph.) Yes.
BY MR. DAWS:
Q. Okay. Thank you. Ma'am, do you agree that it was an error on your behalf to fail to undo that chain?
A. Yes.
Q. Okay. And do you agree that that error, it was preventable?
A. Yes.
Q. And do you believe that that preventable error caused a dangerous situation to happen because of

all the pressure that was put up against that back gate?
A. Potentially. It didn't have to be dangerous.
Q. Do you think that -- do you think that -- looking back, do you think CEI should have trained you what to do on situations like this and how to depressurize a back gate in this kind of situation?
A. No, because it was an honest mistake. It wasn't part of the every-day job.
Q. Do you agree that it's foreseeable that, if you -- well, it's foreseeable that people will forget to do things from time to time; right?
A. Yes.
Q. And is it foreseeable that if someone forgets to unhook either one or both chains on that dump gate, and then, they tip it, that it's going to cause a lot of pressure to build up against that dump gate?
A. Yes.
Q. And that it could -- the pressure could be so great to where you would be in a situation like this where you cannot use the binder to unhook the chain?
A. Yes.
Q. Looking back, do you think that there's anything that you could have done differently to have prevented this incident from happening?

A. I mean, it was human error. It was an honest mistake. Other than not making a mistake I didn't mean to make in the first place.
Q. And I get that. Other than not unhooking the chain, but dealing with the problem that was created because of it --
A. Um-hum. (Witness nods head.)
Q. -- looking back, do you think that there's anything that you could have done differently to have handled the chain situation so that this incident wouldn't have happened?
A. Well, had I had --
MS. O'CONNELL:
Object to the form. You can answer.
THE WITNESS:
Okay.
A. Had I had the knowledge that there was an alternate way to relieve that pressure, yes, knowing now. Then, I didn't know.
BY MR. DAWS:
Q. If you would have known that, is that what you would have --
A. Yes.
Q. -- said needed to be done?
A. Yes.

door knowing the pressure that was already applied to it.
Q. All right. So, I just want to make sure I've got all this down. One, you're saying you never asked John for assistance?
A. Correct.
Q. I mean, you were there whenever he pulled up with the bolt cutters. And during the minutes that passed between whenever that first happened, you saw him working on trying to cut it, you never said, John, I don't want your assistance; right?
A. I never said I didn't appreciate him trying to help me. I said I never asked him to help me.
Q. You had asked Charles?
A. Correct.
Q. Okay. And somehow, Waste Management asked John, and he showed up to help?
A. Correct.
Q. And you were fully aware of that?
A. Yes.
MR. DAWS:
Let me just take a look at my notes, ma'am, and I think we're about finished.
THE WITNESS:
Okay.

BY MR. DAWS:
Q. Okay. I just have one last question for you, Ms. Lyles. Do you agree that during the entire time that Charles and John Barnett were trying to help you with this chain, that you retained the exclusive right on how that problem was going to be dealt with, who was going to be dealt -- who was going to deal with it, and whether or not any efforts to unhook that chain should be stopped?
MS. O'CONNELL:
Object to form.
A. I'm not understanding.
BY MR. DAWS:
Q. That's probably a bad question. It's true that for the entire time that John was trying to help you get the chain unstuck, that you retained the right to decide how the chain issue would be addressed, whether it should be stopped and who would help --
MS. O'CONNELL:
Object to form.
BY MR. DAWS:
Q. -- correct?
A. Correct.
Q. Okay.
MR. DAWS:

Q. Why not?
A. It's dangerous.
Q. Why is it dangerous?
A. You're standing over a pit that's covered -- I mean filled with only God knows what in it.
Q. And so, what, you could get --
A. You could fall. You could break your neck. You could get -- land on something and impale yourself when you get to the bottom. You know, a lot could happen.
Q. Okay. I'm going to show you some photos. I'm going to mark them real quick. So, you testified earlier you don't know exactly where Mr. Barnett was standing once he got up on to the top of the platform; correct?
A. Correct.
Q. Okay. Mr. Barnett testified that he was kind of to the corner, between, like, the side guard of the tipper. So, do you see this one that I just marked, this photo I just marked as Exhibit 28 (indicating)?
(Photograph marked for identification as Exhibit No. 28.)
A. (Viewing photograph.) Yes.
BY MS. O'CONNELL:
Q. Does this look like a photograph, I guess, if you're in the pit looking up at the trailer backed onto the

tipper?
A. (Viewing photograph.) Yes.
Q. Okay. And so, this right here on 28, these two things would be the side guards; correct (indicating)?
A. (Viewing photograph.) Correct.
Q. Okay. And you see how this thing, this is, I guess, these, like, support arms where you said earlier that prevents the trailer from falling off the tipper due to wind or whatever (indicating)?
A. (Viewing photograph.) Yes.
Q. Okay. So, when the trailer is backed into here, if you're on the outside of those guard arms, are you on the outside of the door clearance, generally (indicating)?
A. (Viewing photograph.) Yes.
Q. So, generally, if that door is coming open, it's coming open in between those two guards (indicating)?
A. (Viewing photograph.) Correct.
Q. Do you agree with that?
A. Yes.
Q. Okay. So, Mr. Barnett, basically, testified -- and I don't want to put words in his mouth -- but he was kind of up here (indicating), basically where I'm

marking an "X" in this corner (indicating); okay? And he testified he had enough room -- you see where there is this gap in between the side of the trailer and the side guard (indicating)?
A. (Viewing photograph.) Yes.
Q. Yeah. Do you know about how big that gap typically is when the trailer is totally backed onto the tipper?
A. Inches.
Q. Like, how many?
A. Like --
Q. It's hard to tell from photos; right? And --
A. Yeah, it's less than a foot.
Q. Would I be able to fit through it?
A. Sideways.
Q. Okay. If I was sideways, would that door, maybe, still brush me if it came open?
A. It's possible, yes.
Q. Okay. So, if Mr. Barnett was in that corner, would you expect that door to hit -- would you expect that door to hit anybody standing in this corner based on your knowledge of the tipper (indicating)?
A. (Viewing photograph.) Absolutely.
Q. Okay. And just if that door just swings in its usual manner?

A. Yes. Anywhere between those two plates.
Q. Okay. And then, here, here is another one.
(Showing photograph.)
MS. O'CONNELL:
I marked this photo as Exhibit 29.
(Photograph marked for identification as Exhibit No. 29.)
BY MS. O'CONNELL:
Q. Is this also another photo, just a slightly different angle of the back of the tipper from the pit (indicating)?
A. (Viewing photograph.) Correct.
Q. Okay. And then, the same thing here. Over here on the right, this would be the passenger side of the trailer (indicating)?
A. (Viewing photograph.) Yes.
Q. Okay. And the same thing, it's that same kind of small gap right there (indicating)?
A. (Viewing photograph.) Yes.
Q. So, if somebody is -- if somebody is standing, like, in the corner by the side guardrail, would you still consider them to be in front of that trailer door?
A. Yes.
Q. Can you imagine any scenario where somebody is standing on this platform (indicating), on the inside of the narrow parts of these guardrails

(indicating), and they're not in front of that trailer door?
A. (Viewing photograph.) Can I imagine a scenario --
Q. Yeah. Like --
A. -- what, will they be okay?
Q. Yeah.
A. No.
Q. Okay. When Mr. Barnett got up on to the platform, did you know what he was doing?
A. No.
Q. Did you anticipate that he was going to be cutting from up there?
A. No. I never would have thought that's what he was doing.
Q. Why wouldn't you have anticipated that that's what he was doing?
A. Because for one, it was extremely obvious the pressure already pressed on the door with the way it was wedged out. And it's common sense, anyone who has any safety training ever, or any common sense, knows you don't get behind a door that's got 25 tons pressing on it.
Q. By the time you realized he had gotten up there, you didn't see him actually trying to cut the bolt?
A. No.

Q. Because you were talking to Hickory?
A. Yes.
Q. And you said this all went by pretty quick?
A. Yes.
Q. Okay. And then, here is another photo. This is another photo. (Handing photograph.) It looks like it's of the tipping process just as the trailer is coming up; right?
A. Okay. (Viewing photograph.) Yes.
Q. And labeled that as Exhibit 30?
(Photograph marked for identification as Exhibit No. 30.)
A. (Viewing photograph.) Yes.
BY MS. O'CONNELL:
Q. The same thing; right, there's a pretty small gap right there in the corner (indicating)?
A. (Viewing photograph.) Correct.
Q. Can you guarantee the safety of everybody around your truck at all times --
A. No.
Q. -- under every circumstance?
A. No.
Q. Okay. You talked a lot about the handbook in this case, and how you're supposed to report unsafe conditions. Do you consider a chain getting stuck at the landfill a reportable condition --

and the bolt cutters?
A. Yes. They have everything in the landfill.
Q. Is knowing how to use a grinder or a bolt cutter something that you really needed to know how to do in your employment with CEI?
A. No.
Q. Why not?
A. This is not a typical day problem that you have.
Q. Is that something landfill employees typically did?
A. Yes. Anytime we ever had any kind of hang-ups or anything, the landfill took care of it.
Q. Okay. You testified very briefly, and I just wanted to clarify. You made a comment Cecilia didn't want anybody by the tipper. Were you referring to before or after the accident?
A. After.
Q. Okay. Did Cecilia ever make any comments about Waste Management employees not being by the tipper before the accident?
A. No, not to me.
Q. You mentioned earlier that Mr. Barnett would pick up, like, bungee cords and binders and put them in the shop?
A. Yes.
Q. So, he was picking up CEI equipment?

A. Yes.
Q. To your knowledge, did anybody ask him to do that?
A. No.
Q. Why would he pick up CEI equipment and take custody of it and put it in the shop?
A. He just did it for me.
Q. Was that just another one of the things where you felt like the Waste Management employees were there to assist the drivers --
A. Yes.
Q. -- to efficiently dump?
A. Yes.
Q. How long are those trailers?
A. 48 feet or 53 feet.
Q. Okay. So, if the trailer is being dumped, it's not being dumped straight up and down; right?
A. No. It's at an angle.
Q. Okay. Do you know what degree angle it is, about?
A. It's about a 45-degree angle.
Q. Okay. So, if the dump -- if the trailer is 48 feet and it's at a 45-degree angle, it's sticking pretty high up in the air?
A. Yes.
Q. People from pretty far away can see when you guys are dumping?

A. You can see it at the bottom of the hill.
Q. Okay. And given how quickly Charles showed up to the scene, is it more likely than not that he saw you dumping?
A. Yes.
MR. DAWS:
Objection --
BY MS. O'CONNELL:
Q. Is that why he showed up to the scene?
MR. DAWS:
I'm sorry. Objection. Speculation.
BY MS. O'CONNELL:
Q. Is that why he showed up to the scene?
A. I'm not sure if that's why he showed up.
Q. Okay. You were asked some questions about your conversations. How is it that, at the scene, you were sure everybody knew that you had dumped your trailer?
A. Because everyone was talking about it and everyone was picking on me.
Q. Okay. They were talking about what specifically, though?
A. That I had attempted to dump the load and the chain was still hung up.
Q. Okay. So, you don't have a -- now, you already

A. Yes.
Q. And you were talking to Hickory at some point. Is it -- I don't know if Charles tried to cut the chain or not. Is it possible that you missed that part because you were talking to Hickory?
A. It's possible.
Q. But you just don't remember?
A. I just don't remember seeing him with it.
Q. Okay. And you stated (quoted as read), "When John climbed up on the tipper." Did you even realize what he was doing?
A. No.
Q. Do you know whether or not anybody else realized what he was doing?
A. None of us could have realized what he was doing. We would have stopped him.
Q. Okay. Now, when you came back to the landfill for your third load, did you talk to any Waste Management employees about the accident?
A. Yes, Corey.
Q. And what did you and Corey talk about?
A. I had asked him how John was, and he was telling me to stop crying because it wasn't my fault, John made that decision, not me.
Q. You were upset?

A. Yes.
Q. Yeah. It's, obviously, very upsetting to see someone hurt like this; right?
A. Yes.
Q. And that's upsetting regardless of who we -- the attorneys are going to argue about whose fault it is; right?
A. Yes.
Q. You were asked some questions about your conversations with CEI following the accident. You were asked about if you spoke with anyone with CEI after April 10, 2020 about the accident. Did anyone with CEI's safety department ever talk to you about the accident?
A. Yes.
Q. And who was that?
A. Mr. John and Georgia.
Q. Why didn't you mention that when you were asked earlier in your deposition?
A. I -- I -- I don't know if I just forgot or -- I'm not real sure. Mr. John had called me. We had a quick conversation on what exactly happened and that was it.
Q. Do you recall when Mr. John called you?
A. I don't remember the date. I just remember it was

in the afternoon time.
Q. Like, a week after the accident, a month after the accident?
A. A week-ish, yes.
Q. Okay. Do you know Mr. John's last name?
A. I do not.
Q. Do you recall, did you talk to Joe, at all, about the accident after April 10, 2020?
A. No.
Q. He didn't call you asking you additional details?
A. He called and asked me the trailer number, if I remembered the trailer number and --
Q. Okay.
A. -- what load of the day it was.
Q. But not specifics about the accident?
A. No. No.
Q. Okay. Sorry. And finally, just the last question, opposing counsel concluded with a question about whether or not you had a right to stop what John and Charles were doing or to maintain control over the process; do you recall that question?
A. Yes.
Q. Was it your impression, at that point, that John and Charles had taken over that process?
A. Yes.

Q. Okay.
MS. O'CONNELL:
That's all the questions I have for you.
THE WITNESS:
Okay.
MR. DAWS:
Thank you very much. We're done.
(The deposition is concluded at 4:14 P.M.)

**REPORTER'S PAGE**

I, Kristina Marie Carter, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record:

that due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript; and that any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."

Kristina Marie Carter
Certified Court Reporter
Louisiana License #2018003

**REPORTER'S CERTIFICATE**

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, Kristina Marie Carter, Certified Court Reporter in and for the State of Louisiana, as the officer before whom the testimony was administered, do hereby certify that JENNIFER LYLES, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing (276) pages;

That this testimony was reported by me in the voice-writing reporting method; was prepared and transcribed by me or under my personal direction, and is a true and correct transcript to the best of my ability and understanding;

That the foregoing transcript has been prepared in compliance with transcript format guidelines required by statute or by the Rules of the Louisiana Certified Shorthand Reporter Board; and that I am informed about the complete arrangement, financial or otherwise, with the person or entity making arrangement for deposition services; that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I have no actual knowledge of any prohibited employment or contractual relationship, direct or indirect, between a court reporting firm and any party litigant in this matter, nor is there any such relationship between myself and a party litigant in this matter;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of the matter.

This DECEMBER 11, 2020, Gonzales, Louisiana.

Kristina Marie Carter
Certified Court Reporter
Louisiana License #2018003


Connection
Chain
Binder
WARNING
tabbies
EXHIBIT
7-1


EXHIBIT
tabbies


EXHIBIT
25
tabbies


tabbies
EXHIBIT
28

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **JOHN BARNETT** | § | **CIVIL ACTION NO.: 1:20-CV-280** |
| | § | |
| | § | |
| **VERSUS** | § | **JUDGE: MARCIA A. CRONE** |
| | § | |
| | § | **MAG. JUDGE:** |
| **STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY INC** | § | |
| | § | |
| | § | **JURY TRIAL** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JOHN BARNETT, hereinafter referred to as Plaintiff, and file this his First Amended Complaint complaining of STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY, INC. (hereinafter, "CEI") and JENNIFER LYLES (hereinafter, "Lyles"), collectively referred to as "Defendants", and for cause of action would respectfully show unto the Court and Jury the following:

## I. PARTIES

Plaintiff, JOHN BARNETT, is a resident of Jasper County, Texas.

Defendant, STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY, INC., is a for-profit corporation doing business in the State of Texas. CEI's principal office is located in Sulphur, Louisiana. CEI has made an appearance in this case by and through its attorney of record Jen A. O'Connell.

Defendant, JENNIFER LYLES, is a resident of Jefferson Davis Parish, Louisiana, who may be served at 523 Calcasieu Avenue, Lake Arthur, Louisiana 70549. Plaintiff requests that the Clerk of Court issue a summons and forward it to Plaintiff's counsel to be served by private process server.

EXHIBIT
C

## II. STANDING AND CAPACITY

Plaintiff has Constitutional Standing to bring this Complaint because (1) there was an "injury in fact," (2) there is a fairly traceable connection between Plaintiff's injuries and Defendants' alleged conduct, and (3) the requested relief will remedy the alleged injury. Plaintiff has capacity to bring this suit pursuant to the laws of the State of Texas.

## III. JURISDICTION

Pursuant to 28 USC §1332, this Court has jurisdiction of this matter because the amount in controversy exceeds $75,000 and complete diversity exists between the parties.

## IV. VENUE

Venue is proper in the Eastern District of Texas because it is the district where a substantial part of the events or omissions giving rise to the claim occurred.

## V. STATEMENT OF CLAIM

This worksite injury occurred on April 10, 2020 at the Waste Management Landfill in Newton County, Deweyville, Texas. CEI is a national waste transportation company based out of Mableton, Georgia. CEI operates over 600 tractors and 1000 trailers daily. One of the locations that CEI operates out of is in Sulphur, Louisiana. CEI drivers will transport waste (household garbage, material containing asbestos, debris, etc.) from south west Louisiana to a landfill in Deweyville, Texas. The landfill is owned and operated by Waste Management.

CEI drivers typically make (4) four runs from southwest Louisiana to the Waste Management site in Deweyville, Texas each day. When arriving at the landfill, the drivers are responsible for the entire process of unloading their trailers without the assistance of Waste Management employees. The process for unloading CEI trailers is as follows:

1. The driver will drive pass through the "scale house" where tractors and trailers are weighed and drive to a "tipper." The tipper is a machine that tips the trailer to offload it.

2. When arriving at the tipper, the driver will back the trailer onto the tipper, unhitch the tractor from the trailer, and pull the tractor away from the tipper.

3. The driver will then unlatch (2) two chains on the back of the trailer that keep the back-dump gate closed during transport so that the dump gate will open when tipped.

4. Finally, the driver will operate the tipper to offload the debris.

The tipper literally raises one end of the trailer up allowing gravity to pull the garbage out of the backend of the trailer and into a hole. Once the garbage is emptied out of the back of the trailer, the driver will lower the tipper, reconnect the dump gate chains, reconnect the tractor to the trailer, and begin the trip back to Louisiana to get the next load.

On the day of the incident a Jennifer Lyles, a CEI employee, entered the landfill and drove to the tipper. This driver was working in the course and scope of her employment with CEI. Jennifer unhooked one, but not both chains that keep the back-dump gate on the trailer closed. Jennifer attempted to tip the trailer twice to unload its contents. When the contents did not come out of the trailer on the second attempt, Jennifer realized that she forgot to unhook both dump gate chains. Jennifer then lowered the tipper back to the ground and attempted to unhook the second chain. Because of the pressure from the contents being tipped against the dump gate, she was unable to unhook the second chain.

John Barnett, the only maintenance person at the landfill, was asked to assist. John drove himself and a pair of bolt-cutters from a shop on site to the tipper. Jennifer told John that she could not unhook the chain and asked if John could cut the chain so that she could unload her trailer. At no point in time did Jennifer ever tell John that she had already tipped the trailer twice pushing the contents against the back gate.

As Jennifer requested, John used the bolt-cutters to cut the chain. Unbeknownst to John, there was so much pressure on the back-dump gate that when the chain was cut, the back-gate swung out and hit John in the face and upper body. John was thrown back approximately (5) five feet and fell to the bottom of a approximately (10) ten feet deep hole landing on an air conditioning unit in the bottom of the hole.

John was taken to the Emergency Room at Baptist Hospital with a traumatic brain injury and a laceration across his face. Unable to properly treat John's traumatic brain injury, Baptist rushed John to Memorial Hermann in Houston for further treatment. At Memorial Hermann, John was diagnosed with a brain bleed and fractures of nearly every bone in his face. Once the brain bleed was stabilized, John was taken to surgery where he had multiple metal plates and screws inserted in his face to repair the numerous broken bones. John is currently unable to eat solid food. The extent of John's traumatic brain injury and other injuries to his body are still being discovered.

## VI. ALLEGATIONS AGAINST CEI

### A. *Negligence*

At all times relevant to the allegations of this Complaint, Defendant CEI had a duty to act as a reasonable and prudent commercial waste transportation company. It breached this duty and was negligent. Its negligence was the sole and/or an aggregate proximate cause of this wreck and Plaintiff's resulting injuries and damages. Its negligence includes, but is not limited to, the following:

1) Failing to maintain its trailer in a reasonable working manner so that it could be operated safely and without the need for cutting chains;

2) Failing to properly train and supervise its drivers on proper tipper offloading procedures and the potential dangers associated with failed tipping attempts;

3) Failing to provide its employees with proper equipment;

4) Failing to remove both dump gate chains before attempting to tip the trailer;

5) Failing to reasonably advise and warn Plaintiff about the prior two unsuccessful attempts to tip the trailer before asking him to cut the chain;

6) Failing to properly train and supervise its drivers regarding how to safely remove and/or cut a chain under the circumstances of two prior failed tipping attempts;

7) Such other and further acts of negligence as may be supplemented as a result of discovery performed in this suit.

**B. *Respondeat Superior***

Further, at all times relevant to this case, Lyles was the agent, servant, and/or employee of CEI and was working within the course and scope of her employment or relationship for them and in furtherance of their business. Accordingly, CEI is vicariously liable to Plaintiff for Lyles' acts and/or omissions pursuant to respondeat superior and other laws of agency.

## VII. ALLEGATIONS AGAINST JENNIFER LYLES

**A. *Negligence***

At all times relevant to the allegations of this Complaint, Soirez had a duty to act as a reasonable and prudent commercial motor vehicle operator. She breached this duty and was negligent. Her negligence was the sole and/or an aggregate proximate cause of this wreck and Plaintiff's resulting injuries and damages. Her negligence includes, but is not limited to, the following:

1) Failing to maintain her trailer in a reasonable working manner so that it could be operated safely and without the need for cutting chains;

2) Failing to remove both dump gate chains before attempting to tip the trailer;

3) Failing to reasonably advise and warn Plaintiff about the prior two unsuccessful attempts to tip the trailer before asking him to cut the chain;

4) Failing to properly supervise the cutting of the chain under the circumstances of two prior failed tipping attempts;

5) Creating a dangerous situation and failing to take reasonable steps to avoid causing injury to Plaintiff

6) Such other and further acts of negligence as may be supplemented as a result of discovery performed in this suit.

## VIII. GROSS NEGLIGENCE

Punitive damages are permissible when a defendant has acted in gross negligence. Gross negligence requires a showing that 1) the defendant's acts and omissions constitute an extreme degree of risk considering the probability and magnitude of potential harm to others and 2) the defendant was subjectively aware of that risk and nevertheless proceeded with a conscious indifference to the rights, safety, or welfare of others.

The aforementioned acts and omissions of Defendants constitutes an extreme degree of risk to others. Despite knowing of these extreme risks, Defendant nevertheless acted with a conscious indifference to the rights, safety, and welfare of John Barnett. Therefore, Defendant acted with gross negligence.

## IX. DAMAGES

As a proximate result of the incident made the basis of this suit and Defendant's negligent acts and omissions, Plaintiff brings this suit against Defendant to recover damages for the following items:

(1) Past medical bills and expenses incurred as a proximate result of the accident made the basis of this suit;

(2) Future medical bills and expenses that in all reasonable probability will be incurred as a proximate result of the accident made the basis of this suit;

(3) Mental anguish, physical pain and suffering, disability, and loss of enjoyment of life in the past and in the future;

(4) Loss of earning capacity sustained in the past;

(5) Loss of earning capacity that, in reasonable probability, will be sustained in the future;

(6) Physical impairment in the past and in the future;

(7) Pre-judgment and post-judgment interest;

(8) Reasonable and Necessary attorney's fees in the event this case is appealed to the 5TH Circuit Court of Appeals and/or the United States Supreme Court; and

(9) Such other and further items of damages as may be supplemented as a result of the discovery performed in this suit.

## X. EXEMPLARY DAMAGES

The above paragraphs are incorporated by reference. The acts and omissions of Defendants referenced above not only constitute negligence, but gross negligence and wanton and willful misconduct towards the rights, safety, and welfare of others, including John Barnett, thereby entitling Plaintiff to recover punitive or exemplary damages in such amount as the jury finds to be proper upon trial of this matter.

## XI. CONDITIONS PRECEDENT

All conditions precedent have occurred or have been performed.

## XII. JURY TRIAL REQUEST

Plaintiffs respectfully request that this case be tried to a jury. Jury fees have been paid accordingly.

## XIII. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, JOHN BARNETT, prays that Defendants, STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY, INC. and JENNIFER LYLES appear and answer herein as the law directs, and that upon final hearing and trial by jury, Plaintiff have and recover of and from Defendants his items of damages, punitive damages, costs of court, and pre-judgment and post-judgment interest, and that Plaintiff be entitled

to such other and further relief, both at law and in equity, to which he may show himself justly entitled.

Respectfully submitted,

THE DAWS LAW FIRM

/s/ *Malachi Daws*
**MALACHI DAWS**
State Bar No. 24082904
**JUDSON DAWS**
State Bar No.: 24101682
4055 Dowlen Road
Beaumont, TX 77706
P: (409) 838-6000
F: (409) 838-6003
E: mdaws@dawslawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Discovery has been forwarded to the following counsel of record on this 7th day of August 2020, pursuant to the FEDERAL RULES OF CIVIL PROCEDURE:

/s/ *Malachi Daws*
**MALACHI DAWS**

**JEN A. O'CONNELL**
4041 Essen Lane, Suite 500
Baton Rouge, Louisiana
70809 Ph.: 225-387-9888
Fax: 225-387-9886
E-Mail: joconnell@twpdlaw.com
**ATTORNEYS FOR DEFENDANT:**
STAFFORD TRANSPORT OF LOUISIANA D/B/A CUSTOM ECOLOGY INC.
*Via Email: joconnell@twpdlaw.com*